UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:

|  |  |
|---|---|
|  | Case no. 23-bk-13960-EPK |
| SONAVATION, INC., | Chapter 11 |
| Debtor. | |

_____/

**DISCLOSURE STATEMENT FOR PLAN OF LIQUIDATION UNDER
CHAPTER 11 OF THE BANKRUPTCY CODE FOR SONAVATION, INC.**

**October 30, 2023**

Paul N. Mascia, Esq.
Florida Bar No. 489670
Michael A. Nardella, Esq.
Florida Bar No. 051265
**Nardella & Nardella, PLLC**
135 W. Central Blvd., Suite 300
Orlando, FL 32801
(407) 966-2680
pmascia@nardellalaw.com
mnardella@nardellalaw.com
klynch@nardellalaw.com

Attorneys for Debtor and
Debtor in Possession

THIS DISCLOSURE STATEMENT FOR PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE FOR SONAVATION, INC (THE "**DISCLOSURE STATEMENT**") MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE FOR SONAVATION, INC (THE "**PLAN**") DATED AS OF 10/30/2023(AS FURTHER AMENDED FROM TIME TO TIME).

ALL CREDITORS AND HOLDERS OF EQUITY INTERESTS THAT ARE ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE ENTIRE DISCLOSURE STATEMENT FURNISHED TO THEM AND THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT, PRIOR TO SUBMITTING A BALLOT PURSUANT TO THIS SOLICITATION. THE DESCRIPTION OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT IS INTENDED AS A SUMMARY ONLY AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN ITSELF.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. IN ADDITION, THE DISCLOSURE STATEMENT AND THE PLAN HAVE NOT BEEN REQUIRED TO BE PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW.

NO PERSON IS AUTHORIZED BY THE DEBTOR IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO OR THE ACCOMPANYING DOCUMENTS INCORPORATED BY REFERENCE OR REFERRED TO HEREIN AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTOR. TO THE BANKRUPTCY COURT FOR ACTION AS MAY BE DEEMED APPROPRIATE. CREDITORS AND HOLDERS OF EQUITY INTERESTS ARE ENCOURAGED TO REVIEW THE DOCKET IN THE LIQUIDATION CASE IN ORDER TO APPRISE THEMSELVES OF EVENTS WHICH OCCUR BETWEEN THE DATE OF THIS DISCLOSURE STATEMENT AND THE DATE OF THE CONFIRMATION HEARING.

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, UNLESS OTHERWISE STATED, ALL STATEMENTS IN THIS DISCLOSURE STATEMENT AND IN THE ACCOMPANYING PLAN CONCERNING THE HISTORY OF THE DEBTOR'S BUSINESS, THE PAST OR PRESENT FINANCIAL CONDITION OF THE DEBTOR, TRANSACTIONS TO WHICH THE DEBTOR WAS OR IS A PARTY, OR THE EFFECT OF CONFIRMATION OF THE PLAN ON HOLDERS OF CLAIMS AGAINST AND

EQUITY INTERESTS IN THE DEBTOR ARE ATTRIBUTABLE EXCLUSIVELY TO THE DEBTOR AND NOT TO ANY OTHER PARTY. NONE OF THE ATTORNEYS, ACCOUNTANTS, OR OTHER PROFESSIONALS RETAINED BY THE DEBTOR MAKE ANY REPRESENTATIONS CONCERNING SUCH INFORMATION.

IN THE EVENT THAT ANY IMPAIRED CLASS OF CLAIMS OR EQUITY INTERESTS VOTES TO REJECT THE PLAN, (1) THE DEBTOR MAY ALSO SEEK TO SATISFY THE REQUIREMENTS FOR CONFIRMATION OF THE PLAN WITH RESPECT TO THAT CLASS UNDER THE BANKRUPTCY CODE'S "CRAMDOWN" PROVISIONS AND, IF REQUIRED, MAY AMEND THE PLAN TO CONFORM TO SUCH REQUIREMENTS, OR (2) THE PLAN MAY BE OTHERWISE MODIFIED OR WITHDRAWN.

THE REQUIREMENTS FOR CONFIRMATION, INCLUDING THE VOTE OF IMPAIRED CLASSES OF CLAIMS AND EQUITY INTERESTS TO ACCEPT THE PLAN AND CERTAIN OF THE STATUTORY FINDINGS THAT MUST BE MADE BY THE BANKRUPTCY COURT, ARE SET FORTH IN THIS DISCLOSURE STATEMENT

## __INDEX OF EXHIBITS TO DISCLOSURE STATEMENT__

EXHIBIT A – PLAN OF LIQUIDATION

**DISCLOSURE STATEMENT PURSUANT
TO SECTION 1125 OF THE BANKRUPTCY CODE**

## ARTICLE I - INTRODUCTION

**A.    Overview of Chapter 11**.   The commencement of a chapter 11 case creates an estate comprising all the legal and equitable interests of the debtor in property as of the date the bankruptcy petition is filed. Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor in possession" unless the bankruptcy court orders the appointment of a trustee. In the present chapter 11 case, the Debtor has remained in possession of its property and continued to operate its business as a debtor in possession.

The filing of a chapter 11 petition also triggers the automatic stay provisions of the Bankruptcy Code. Section 362 of the Bankruptcy Code provides, *inter alia,* for an automatic stay of all attempts to collect prepetition claims from the debtor or otherwise interfere with its property or business. Except as otherwise ordered by the bankruptcy court, the automatic stay remains in full force and effect until the effective date of a confirmed plan of reorganization.

The formulation of a plan is the principal purpose of a chapter 11 case.  The plan sets forth the means for satisfying the claims against and interests in the debtor.  Generally, unless a trustee is appointed, only the debtor may file a plan during the first 120 days of a chapter 11 case (the "Exclusive Period").  However, section 1121(d) of the Bankruptcy Code permits the court to extend or reduce the Exclusive Period upon a showing of "cause." After the Exclusive Period has expired, a creditor or any other party in interest may file a plan, unless the debtor has filed a plan within the Exclusive Period, in which case, the debtor is generally given 60 additional days (the "Solicitation Period") during which it may solicit acceptances of its plan.  The Solicitation Period may also be extended or reduced by the court upon a showing of "cause".  In this case, the Exclusivity Period has been extended to December 18, 2023.

**B.    Plan of Liquidation**.   A plan may provide anything from a complex restructuring of an individual debtor or a debtor's business and its related obligations to liquidation of the debtor's assets. After a plan has been filed, the holders of claims against or interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. This Disclosure Statement is presented to Holders of Claims against the Debtor to satisfy the requirements of section 1125 of the Bankruptcy Code.

If all classes of claims and equity interests accept a plan of reorganization, the bankruptcy court may nonetheless not confirm the plan unless the court independently determines that the requirements of section 1129 of the Bankruptcy Code have been satisfied. Section 1129 sets forth the requirements for confirmation of a plan and, among

other things, requires that a plan meet the "best interests" test and be "feasible." The "best interests" test requires that the value of the consideration to be distributed to the holders of claims and equity interests under a plan may not be less than those parties would receive if the debtor were liquidated pursuant to a hypothetical liquidation occurring under Chapter 7 of the Bankruptcy Code. Under the "feasibility" requirement, the court must find that there is a reasonable probability that the debtor will be able to meet its obligations under its plan without the need for further financial reorganization.

The Debtor believes that the Plan satisfies all the applicable requirements of section 1129(a) of the Bankruptcy Code, including, the "best interests" test and the "feasibility" requirement. The Debtor supports confirmation of the Plan and urges all Holders of impaired Claims to accept the Plan.

Chapter 11 does not require that each holder of a claim against a debtor vote in favor of a plan of reorganization for the bankruptcy court to confirm the plan. At a minimum, however, the plan must be accepted by a majority in number and two-thirds in amount of those claims actually voting in at least one class of impaired claims under the plan. The Bankruptcy Code also defines acceptance of the plan by a class of equity interests (equity securities) as acceptance by holders of two-thirds of the number of shares actually voting.

In addition, classes of claims or equity interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and thus are not entitled to vote. Accordingly, acceptances of a plan will be solicited only from those persons who hold claims or equity interests in an impaired class. A class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or equity interests of that class are modified in any way under the plan. Modification for purposes of determining impairment, however, does not include curing defaults and reinstating maturity.

In the present case, Classes III, IV, V, VI and VII are Impaired Classes under the Plan, and the Holders of Claims and Interests in those Classes are entitled to vote to accept or reject the Plan.

The bankruptcy court may also confirm a plan of reorganization even though fewer than all the classes of impaired claims and interests accept it. For a plan of reorganization to be confirmed despite its rejection by a class of impaired claims or interests, the proponents of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or interests that has not accepted the plan. The process of confirming a plan under these conditions is known as a "cramdown."

Under section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a class of rejecting claims if, among other things, the plan provides: (a) with respect to secured claims, that each such holder will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; and (b) with respect to unsecured claims and equity interests, that the holder of any claim or equity interest that is junior to the claims or equity interests of such class will not

receive or retain on account of such junior claim or equity interest any property at all unless the senior class is paid in full, excluding exempt property and property included in the estate under section 1115 of the Bankruptcy Code.

A plan does not "discriminate unfairly" against a rejecting class of claims if (a) the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated claims, and (b) no senior class of claims is to receive more than 100% of the amount of the claims in such senior class.

The Debtor believes that the Plan has been structured so that it will satisfy these requirements as to any rejecting Class of Claims and can therefore be confirmed, if necessary, over the objection of any Classes of Claims. The Debtor, therefore, reserves the right to request confirmation of the Plan under the "cramdown" provisions of section 1129 of the Bankruptcy Code.

**C.      The Disclosure Statement**.  The purpose of this Disclosure Statement is to provide the Holders of Claims and Equity Interests with adequate information to make an informed judgment about the Plan.  This information includes, among other things, (a) the procedures for voting on the Plan, (b) a summary of the Plan and an explanation of how the Plan will function, including the means of implementing and funding the Plan, (c) general information about the history and business of the Debtor prior to the Petition Date, (d) the events leading to the filing of the Liquidation Case, (e) a summary of significant events occurring in the Liquidation Case, and (f) a brief summary of the plan for liquidating the Debtor's assets.

**NO REPRESENTATION CONCERNING THE DEBTOR IS AUTHORIZED OTHER THAN AS SET FORTH HEREIN. ANY REPRESENTATIONS OR INDUCEMENTS MADE WHICH ARE OTHER THAN AS CONTAINED HEREIN SHOULD NOT BE RELIED UPON IN ARRIVING AT A DECISION ABOUT THE PLAN.**

The information contained herein has not been subject to audit.  For that reason, as well as the complexity of the Debtor's business and the impossibility of making assumptions, estimates and projections with complete accuracy, the Debtor is unable to warrant or represent the information contained herein is without inaccuracy, although every reasonable effort has been made to ensure that such information is accurate.

A copy of the Plan is attached. The Disclosure Statement is qualified in its entirety by reference to the Plan. If there is any inconsistency between the Plan and this Disclosure Statement, then the terms of the Plan shall control. All capitalized terms used in this Disclosure Statement shall have the definitions specified in the Plan unless otherwise defined.

**THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS, AND THE DEBTOR RECOMMENDS THAT CREDITORS VOTE TO ACCEPT THE PLAN.**

3

## ARTICLE II – HISTORY OF THE DEBTOR AND THE CHAPTER 11 CASE

1. **The Debtor**. Sonavation designs and develops leading ultrasound biometric fingerprint sensors for secure authentication into smartphones, tablets, wearables, automotive and other connected devices. Sonavation's ultrasound technology delivers a higher level of security through its robust architecture and provides manufacturers flexibility in innovative industrial design. Sonavation has technology bringing biometric imaging data of highly accurate fingerprint depth and resolution through next generation device protective cover materials such as glass and OLED. Sonavation's 3D ultrasound biometric technology is protected by numerous patents and is headquartered in Palm Beach Gardens, Fla.

2. **The Debtor's Net Operating Losses.** The Debtor invested a great deal of money in research and development for its technology. As a result, as is often the case with a company of its type, it accumulated tax net operating losses (NOLs) and credits. The NOLs accumulated by the Debtor is estimated to be $150 million. Some parties in interest have expressed an interest in exploring the possibility of giving potential buyers the ability to structure a transaction to preserve the NOLs for the benefit of those buyers. Such a proposition is complex, made so by Internal Revenue Code ("IRC"), Section 382.

The Debtor makes no representations or warranties of any kind for the method or success of any attempt to structure an IRC 382 Transaction. IRC 382 imposes a limitation on the use of NOLs when there is any change in ownership. To structure an IRC 382 Transaction, a detailed study must be done to determine the feasibility of the project.

The Debtor has arranged for Hillandale Advisors to perform an IRC Section 382 Study. The Debtor does not have the resources to pay for the study. However, if an interested party will put up the $50,000 cost of the Study, Hillandale has agreed to perform the study and function as Equity Broker for the sale. Hillandale Advisors is a Charlotte, NC-based investment firm that has experience in structuring IRC 382 Transactions.

3. **Events Leading to the Chapter 11 Filing**. Sonavation's technology, while impressive and effective, has not found a buyer for bringing production to the market or to scale. Sonavation has insufficient liquidity to maintain operations or to pay its debts as they come due or maintain its intellectual property. A chapter 11 bankruptcy case would ensure the orderly reorganization or liquidation of its assets, while avoiding further erosion of its intellectual property, and with the expectancy of maximizing the value of its assets, through a sale or merger. Sonavation has also acquired millions of dollars in net operating losses, which, if preservable, may be preserved through chapter 11.

## ARTICLE III - SUMMARY OF THE PLAN

**A.**    **Introduction.**    Under Chapter 11, a debtor is authorized to reorganize and/or liquidate its business for the benefit of itself and its creditors and stockholders. The formulation of a plan is the principal objective of a Chapter 11 case. In general, a Chapter 11 plan (i) divides claims and interests into separate classes, (ii) specifies the property that each class is to receive under such plan, and (iii) contains other provisions necessary to the reorganization and/or liquidation of the Debtor.

The summary of the Plan contained herein addresses only certain provisions of the Plan. As a summary, it is qualified in its entirety by reference to the Plan itself. Upon Confirmation and the Effective Date, the Plan shall bind the Debtor, all of the Debtor's Creditors, the Holders of Equity Interests, and other parties in interest except as expressly set forth in the Plan.

**B.**    **Overview of the Plan**.

   **1.**    **The Liquidating Trust**. The Plan creates a Liquidating Trust to be administered by a Liquidating Trustee to administer the proceeds from the liquidation of the Bankruptcy Estate.

   **2.**    **The Potential Sale of Equity**. Under the Plan, the Debtor has arranged with a Hillandale Advisors (the "Equity Broker") to make its Equity available for sale in a manner consistent with 26 USC 382 (an IRC 382 Restructuring) and make available the Debtor's net operating losses (NOLs) to a buyer.

   **3.**    **The Potential Sale of the Debtor's Intangible Assets and Related Litigation Rights**. If there is not a successful Sale of Equity Interests, the Debtor will proceed with a sale of the Debtor's Intangible Assets and related causes of action. During the case, the Debtor has solicited offers for the sale of the Intangible Assets. Toler Law Group, PC, (the "Asset Stalking Horse") has made a bid (attached hereto as Exhibit C to the Plan) consisting of a cash component of $20,000 and a participation component of sixty percent (60%) of the net proceeds from any litigation of the Causes of Action pertaining to the Intangible Assets. A sale utilizing bid procedures approved by the Court will be conducted approximately sixty days after the Effective Date.

   **C.**    **Acceptance of Plan and Vote Required for Class Acceptance**. Pursuant to Section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if (a) the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. If a Holder of a Claim holds more than one Claim in any one Class, all Claims of such

Holder in such Class shall be aggregated and deemed to be one Claim for purposes of determining the number of Claims in such Class voting on the Plan. Pursuant to Section 1126(d) of the Bankruptcy Code, an Impaired Class of Equity Interests shall have accepted the Plan if the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Equity Interests actually voting in such Class have voted to accept the Plan.

To meet the requirement for confirmation of the Plan under the "cram-down" provisions of the Bankruptcy Code with respect to any Impaired Class of Claims or Equity Interests which votes to reject, or is deemed to vote to reject, the Plan (a "**Rejecting Class**"), the Debtor would have to show that all Classes junior to the Rejecting Class will not receive or retain any Property under the Plan unless all Holders of Claims or Equity Interests in the Rejecting Class receive or retain under the Plan Property having a value equal to the full amount of their Allowed Claims or Allowed Equity Interests.

**D.** **Confirmation Hearing**. The Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing on the confirmation of the Plan. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing. Any objection to confirmation must be made timely in writing, filed with the Bankruptcy Court, and served upon the following parties:

| For the Debtor | Paul N. Mascia, Esq.<br>Florida Bar No. 489670<br>Michael A. Nardella, Esq.<br>Florida Bar No. 051265<br>**Nardella & Nardella, PLLC**<br>135 W. Central Blvd., Suite 300<br>Orlando, Florida 32801<br>407 966 2680<br>pmascia@nardellalaw.com |
|---|---|
| For the U.S, Trustee | Heidi A. Feinman<br>Office of the US Trustee<br>51 SW 1Ave #1204<br>Miami, FL 33130<br>305 536 7285<br>Heidi.A.Feinman@usdoj.gov |

**ARTICLE IV - TREATMENT OF**
**ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS**

**A.** **Nonclassification**. In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Expenses and Priority Tax Claims have not been classified in the Plan. The treatment provided to Administrative Expenses and Priority Tax

Claims is set forth in this Article IV.

**B.** **Administrative Expenses**. Except as otherwise provided in the Plan, each Holder of an Allowed Administrative Expense will be paid (a) on the Effective Date, an amount, in Cash, equal to the Allowed Amount of its Administrative Expense, in accordance with Section 1129(a)(9)(A) of the Bankruptcy Code, (b) under such other terms as may be agreed upon by both the Holder of such Allowed Administrative Expense and the Debtor or Reorganized Debtor, or (c) as otherwise ordered by a Final Order of the Bankruptcy Court.

**C.** **Fees and Charges**. All fees and charges assessed against the Estate under Chapter 123 of Title 28, United States Code, 28 U.S.C. §§1911-1930, through the Confirmation Date, as determined by the Bankruptcy Court in the Confirmation Order, will be paid on or before the Effective Date.

**D.** **Applications for Allowance of Administrative Expenses**. Except as provided herein, all Holders of Administrative Expenses (including Holders of any Claims for non-ad valorem post-petition federal, state, or local taxes) that do not file an application or other Bankruptcy Court-approved pleading by the Administrative Expense Bar Date will be forever barred from asserting such Administrative Expense against the Debtor, the Reorganized Debtor, or any of their respective Properties.

## ARTICLE V - DESIGNATION OF CLASSES OF CLAIMS

For purposes of the Plan, Claims are classified as follow**s**:

1.      Class I is comprised of Allowed Other Secured Claims.

2.      Class II is comprised of the Allowed Non Tax Priority Claims.

3.      Class III is comprised of all Allowed Equity Interests

4.      Class IV is comprised of all Allowed Secured Claim of Cross Match Technologies, Inc.

5.      Class V is comprised of Allowed Junior Secured Claims.

6.      Class VI is comprised of all Allowed Unsecured Claims.

7.      Class VII is comprised of Allowed Claim of Healthcare Investments, LLC

## ARTICLE VI - TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

**A.** **Unimpaired**. The following classes of Claims are unimpaired:

Class I - Allowed Other Secured Claims. This Class consists of Secured Claims not otherwise classified under the Plan. Debtor is not aware of any claims in this class. The Plan does not alter the legal, equitable, or contractual rights of the holders of such Claims.

Class II - Allowed Non-Tax Priority Claims. This Class consists of Claims entitled to priority under Code sections 507(a)(1)-(7), except Administrative Expenses. Debtor is not aware of any claims in this Class. Holders of such Claims shall receive, on account of such Claims, cash in the amount of such Claims.

B.    **Impaired**. The following Claims and Interests are impaired:

Class III - Equity Interests. The Allowed Equity Interests in the Debtor shall be either canceled as of the Effective Date, or alternatively marketed for an Equity Sale by the Equity Broker and then either conveyed pursuant to the Equity Sale, or alternatively cancelled to the extent that any such Equity Interests are not sold at an Equity Sale.

Class IV- Allowed Secured Claim of Cross Match Technologies, Inc. This Claim consists of Cross Match Technologies, Inc's. secured blanket lien on Debtor's business assets.   In the event of an Equity Sale, the holder of this Allowed Claim will retain its lien. In the event of an Asset Sale, the holder of this Allowed Claim will receive on account of such Claim the net proceeds of the Asset Sale in the order of its priority.

Class V –Allowed Junior Secured Claims. This Class consists of the Claims of Soninvest, LLC, Karl Weintz, Locke Lord, LLC, MD Anderson – University of Texas, and Healthcare Investments, Inc., all holders of Allowed Claims secured by a blanket lien on the Debtor's business assets that is junior to the claim of Cross Match. In the event of an Equity Sale, the holder of this Allowed Claim will retain its lien. In the event of an Asset Sale, the holder of this Allowed Claim will receive on account of such Claim the net proceeds of the Asset Sale in the order of their priority.

Class VI- Allowed Unsecured Claims. The holders of such Claims shall receive on account of such Claims a Pro Rata Share of the proceeds of the Equity Sale.  In the event of an Asset Sale, they will receive proceeds of the Asset Sale after payment to Classes IV and V.

Class VII- Allowed Claim of Healthcare Investments, LLC for Post-Petition Financing. The holder of this Allowed Claim shall be entitled to $25,000 plus interest of 5% on the date that all of the holders of Allowed Claims in Classes I through VI are paid in full.

## ARTICLE VII -- MEANS FOR IMPLEMENTATION OF PLAN

Recoveries for creditors in this case will come from the potential sale of the Equity Interests of the Debtor or Sale of the Debtor's Assets by the Liquidating Trust.

The Bankruptcy Estate and the Exculpated Parties shall not have or incur any liability to any person or entity, including any Holder of a Claim or Equity Interest, for any act or omission taken or not taken in connection with, relating to, or arising out of the Chapter 11 Case, including but not limited to: the negotiation and filing of the Plan, the Filing of the Chapter 11 Case, the prosecution and/or settlement of Claims, the performance, termination or rejection of Executory Contracts, the pursuit of confirmation of the Plan, the consummation of the Plan, the administration of the Plan, the property to be Distributed under the Plan, the manner of and any amount realized from any disposition or attempted disposition of the Debtor's assets, any IRC 382 Restructuring (defined below) or any matter relating to the preservation of an opportunity for the Debtor to realize potential value presented by its historical net operating losses (collectively, the "Post-Petition Activities"), except for their fraud, willful misconduct, or gross negligence or any obligations that they have under or in connection with the Plan or the transactions contemplated in the Plan.

**A.  The Liquidating Trust**. The Plan provides for the creation of the Liquidating Trust, responsible for the sale of the Debtor's Intangible Assets and the potential sale of the Equity Interests in the Debtor. If the Equity Interests in the Debtor do not sell through the Plan, then the Equity Interests of the Debtor will be cancelled through the Plan. Holders of Allowed Claims shall be beneficiaries of the Liquidating Trust and entitled to distributions based on the priority and timing set forth in the Plan. The Liquidating Trustee will control the Liquidating Trust. The Liquidating Trust will be vested with all the Debtor's Bankruptcy Estate.

The Liquidating Trust, through the Liquidating Trustee, shall have the full and complete power and authority to perform the provisions of the Plan in such manner as the Liquidating Trust may deem necessary or appropriate to discharge all obligations assumed by the Liquidating Trust or provided herein and to conserve and protect the trust assets or to give to the holders of Allowed Claims the benefits intended to be conferred upon them by this Plan.

**B.  Liquidating Trustee**. The Plan provides for the role of a Trustee (the "Liquidating Trustee") to control the Liquidating Trust and guide efforts to recover the maximum value for the Equity Interests and Assets of the Debtor for the benefit of creditors with Allowed Claims. The initial Liquidating Trustee shall be Lisa Rhoads. The Liquidating Trustee shall be governed by the terms of the Plan, as described below. The Liquidating Trustee shall have the duties and responsibilities as set forth in the Plan and shall be retained, and may be terminated, as provided for in the Plan. However, the Liquidating Trustee shall have all the powers and rights of a Trustee under Chapter 7 and 11 of the Bankruptcy Code.

**C.  Potential Sale of Equity Interests**.

1.      The Debtor has arranged for Hillandale Advisors (the "Equity Broker") to function as Equity Broker to assist the Debtor in attempting to obtain value from the net operating losses for the estate through a sale of the Debtor's Equity Interests.

To engage its services, the Equity Broker requires the funding of upfront costs and fees in the amount of $50,000 (the "Equity Broker's Retainer"), as is more particularly set forth in the terms of the Equity Broker's engagement letter (attached as Exhibit "B" to the Plan).

2.      The Debtor lacks the resources to pay the Equity Broker's Retainer. However, in the solicitation package which shall be sent out with the Plan and Disclosure Statement, the Debtor will provide interested parties with the opportunity to advance the Equity Broker's Retainer the Equity Broker's Retainer on or before fourteen (14) days after the Confirmation Date (the "Retainer Deadline").

3.      If no interested party advances to the Equity Broker the Equity Broker's Retainer on or before the Retainer Deadline, then there shall be no sale of the Debtor's Equity; and in such event the Debtor's Equity Interests shall be cancelled on the Effective Date.

4.      If an interested party advances the Equity Broker's Retainer to the Equity Broker on or before the Retainer Deadline, then the Liquidating Trustee shall, within thirty (30) days after the Confirmation Date, prepare and file bidding procedures for the sale of the Debtor's Equity Interests, to be approved by the Court (the "Equity Bidding Procedures").

5.      Upon the Court's approval of the Equity Bidding Procedures, the Equity Broker shall market the Debtor's Equity Interests for not less than thirty (30) days and conduct a sale of some or all of the Debtor's Equity Interests to the highest bidder, free and clear of all claims and interests (the "Equity Sale"), and utilizing a transaction structure to vest the Debtor's Equity in the name of the buyer consistent with the buyer's goal of preserving the net operating losses of the Debtor in accordance with applicable tax laws, including without limitation 26 U.S.C. § 382 (an "IRC 382 Restructuring"). Upon the consummation of an Equity Sale, any portion of the Debtor's Equity Interests not conveyed in connection with the Equity Sale will either be cancelled or retained by the existing common stockholders on a pro-rata basis.

6.      The sales proceeds from any Equity Sale shall be conveyed to the Liquidation Trust for further distribution in accordance with its terms.

D.      **Sale of Intangible Assets and Related Litigation Rights**.

1.      If there is not a successful Sale of Equity Interests the Debtor will proceed with a sale of the Debtor's Intangible Assets and related causes of action, as follows:

2.      The Debtor's assets consist of the Patents and the Debtor's trade secrets, along with all causes of action ("Causes of Action") related to the same (the "Intangible Assets").

3.      During the case, the Debtor has solicited offers for the sale of the Intangible Assets. Toler Law Group, PC, (the "Asset Stalking Horse") has made a bid (the

Stalking Horse Bid attached as Exhibit C to the Plan) consisting of a cash component of $20,000 and a participation component of sixty percent (60%) of the net proceeds from any litigation of the Causes of Action pertaining to the Intangible Assets.

        4.      Upon the Effective Date, the Debtor's Intangible Assets will vest in the Liquidating Trust.

        5.      Within thirty (30) days after the Effective Date, the Liquidating Trustee shall prepare and file bidding procedures for the sale of the Debtor's Intangible Assets, to be approved by the Court (the "Asset Bidding Procedures"). Thereafter, the Liquidating Trustee shall, within sixty (60) days, conduct an auction of the Intangible Assets (the "Asset Sale") utilizing the Asset Bidding Procedures which will have been approved by the Court. The sale will be free and clear of all claims and interests.

        6.      To be qualified, each bid must consist of a cash component and a participation component.

        7.      The Debtor has arranged for Peak Value IP (the "Asset Broker") to function as Asset Broker to assist the Debtor in marketing the Intangible Assets and conducting the related Asset Sale. The Asset Broker has agreed to conduct the Asset Sale for a success fee in accordance with the terms more particularly set forth in the terms of the Asset Broker's engagement letter (attached as Exhibit "D" to the Plan).

## ARTICLE VIII -- PROVISIONS GOVERNING DISTRIBUTION

    **A.**    **Distributions**. The Liquidating Trust will make distributions under the Plan as follows:

        1.      The proceeds of any Equity Sale shall be paid first to the interested party that advanced the Equity Broker's Retainer in an amount equal to the Equity Broker's Retainer, then to the Equity Broker in satisfaction of the terms of its engagement, then to Allowed Administrative Claims, and then to Allowed Unsecured Claims. The sale of the Equity will necessarily transfer to the buyer of the equity of Debtor's Intellectual Property and Related Litigation Rights and will remain subject to the liens held by the Allowed Secured Claim of Cross Match Securities and the Allowed Junior Secured Claims.

        2.      In the event of an Asset Sale, the proceeds will be made first to the Asset Broker in satisfaction of the terms of its engagement, then to Allowed Administrative Claims, then to Allowed Claims in the order of priority of the liens on the assets, then to Allowed Unsecured Claims and then to Allowed Class VII Claims. Accordingly, distributions will be made as a waterfall first to the allowed claim holder in Class IV, until paid in full, and then to the Allowed Claim holder in Class V until paid in full, etc. through each class until holders of Allowed Claims in Class VI. The Distributions shall be made to Administrative Claims on the date of the closing of the Asset Sale and any Equity Sale.

3. Distributions to Classes IV through V shall be made thirty days after the conclusion of the last Cause of Action sold in connection with the Asset Sale.

4. Distributions to Class VI shall be made on the date that the holders of Allowed Claims in Classes IV through V are paid in full.

5. All distributions shall be made Pro Rata.

6. In the event that there remains any proceeds available for distribution after the foregoing distributions described above (the "Remaining Proceeds"), such Remaining Proceeds shall be distributed to the former holders of Equity Interests according to their respective liquidation preferences, such that distributions shall first be made to Preferred Equity Interests in accordance with their related liquidation preferences, and then, if thereafter there remains any further Remaining Proceeds, the same shall be distributed to the former holders of Equity Interests who owned the common stock of the Debtor, pro-rata according to the their prior relative percentage ownership.

**B.** **De Minimis Distributions**. Notwithstanding any other provision of the Plan, there shall be no distribution of less than $20.00 on account of any Allowed Claim or Interest.

**C.** **Disbursing Agent**. The Liquidating Trustee shall make all distributions required under the Plan.

**D.** **Cash Payments**. Cash payments made pursuant to the Plan shall be in U.S. funds, by check drawn against a domestic bank, or by wire transfer from a domestic bank.

**E.** **Delivery of Distributions**. Distributions and deliveries to holders of Allowed Claims and Interest shall be made at the addresses set forth on the proofs of Claim or Interests filed by such holders (or at the last known addresses of such holders if no proof of Claim or Interest is filed or if the Debtor has been notified of a change of address). If any distribution to a holder is returned as undeliverable, then no further distributions to such holder shall be made unless and until the Debtor is notified of the holder's then-current address, at which time all missed distributions shall be made to such holder, without interest. All Claims for undeliverable distributions shall be made on or before the fifth anniversary of the Distribution Date. After such date, all unclaimed property shall revert to the Debtor, and the claim of any holder with respect to such property shall be discharged and forever barred.

**F.** **Time Bar to Cash Payments**. Checks issued by the Debtor in respect of Allowed Claims shall be null and void if not cashed within ninety (90) days of the date of issuance thereof. Requests for reissuance of any checks shall be made directly to the Debtor by the holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check shall be made on or before the later of the fifth anniversary of the Distribution Date or ninety (90) days after the date of issuance of such

check. After such date, all claims in respect of void checks shall be discharged and forever barred.

## ARTICLE IX - MISCELLANEOUS

**A.** **Executory Contracts.** The Debtor has no known executory contracts or unexpired leases.

**B.** **Section 1146 Exemption**. The Plan provides that, pursuant to Section 1146(a) of the Code, the issuance, transfer or exchange of any security under the Plan or the making or delivery of any instrument of transfer pursuant to, in implementation of, or as contemplated by, the Plan or the re-vesting, transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of, or as contemplated by, the Plan shall not be taxed under any state or local law imposing a stamp tax, transfer tax or similar tax or fee.

**C.** **Effectuating Documents; Further Transactions.** Each officer and director of the Debtor or the Reorganized Debtor, as applicable, shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, mortgages, and other agreements or documents, and take such actions as may be necessary or appropriate, to effectuate and further evidence the terms and conditions of the Plan or to otherwise comply with applicable law.

**D.** **Exclusivity Period.** The Debtor retains the exclusive right to amend or modify the Plan, and to solicit acceptances of any amendments to or modifications of the Plan, through and until the Effective Date.

## ARTICLE X - RETENTION OF JURISDICTION

**A.** **General Retention.** Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, until the Liquidation Case is closed, the Bankruptcy Court shall retain the fullest and most extensive jurisdiction of the Liquidation Case that is permitted by applicable law, including that necessary to ensure that the purposes and intent of the Plan are carried out.

## ARTICLE XI - CERTAIN FEDERAL INCOME TAX CONSEQUENCES

HOLDERS OF CLAIMS AND HOLDERS OF EQUITY INTERESTS (COLLECTIVELY, "HOLDERS") ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.

THE DEBTOR'S GENERAL BANKRUPTCY COUNSEL HAS NO TAX EXPERTISE AND HAS NOT RESEARCHED OR ANALYZED TAX CONSEQUENCES RESULTING FROM THE PLAN.

PERSONS CONCERNED WITH THE TAX CONSEQUENCES OF THE PLAN SHOULD CONSULT THEIR OWN ACCOUNTANTS, ATTORNEYS AND/OR ADVISORS. THE DEBTOR MAKES THE ABOVE-NOTED DISCLOSURE OF POSSIBLE TAX CONSEQUENCES FOR THE SOLE PURPOSE OF ALERTING READERS TO TAX ISSUES THEY MAY WISH TO CONSIDER. THE DEBTOR CANNOT AND DOES NOT REPRESENT THAT THE TAX CONSEQUENCES MENTIONED ABOVE ARE COMPLETELY ACCURATE BECAUSE, AMONG OTHER THINGS, THE TAX LAW EMBODIES COMPLICATED RULES THAT MAKE IT DIFFICULT TO STATE ACCURATELY WHAT THE TAX IMPLICATIONS OF ANY ACTION MIGHT BE.

### ARTICLE XIV ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed, the potential alternatives include (a) alternative plans under Chapter 11, (b) dismissal of the Liquidation Case, or (c) conversion of the Liquidation Case to a case under Chapter 7 of the Bankruptcy Code.

**A.    Liquidation under Chapter 7**.   If a plan is not confirmed, the Liquidation Case may be converted to a Chapter 7 liquidation case.  In a Chapter 7 case, a trustee would be elected or appointed to liquidate the assets of the Debtor.  The proceeds of the liquidation would be distributed to the Creditors of the Debtor in accordance with the priorities established by the Bankruptcy Code.

In general, the Debtor believes that liquidation under Chapter 7 would result in diminution of the value of the interests of the Creditors because of (a) additional administrative expenses involved in the appointment of a trustee and attorneys, accountants and other professionals to assist such trustee; (b) additional expenses and claims, some of which might be entitled to priority, which would arise by reason of the liquidation; (c) the inability to utilize the work product and knowledge of the Debtor and its Professionals; and (d) the substantial delay that would elapse before Creditors would receive any distribution in respect of their Claims.

### ARTICLE XV - SUMMARY, RECOMMENDATION AND CONCLUSION

The Debtor believes that the Plan is in the best interests of all Creditors. In the event of a liquidation of the Debtor's assets under Chapter 7 of the Bankruptcy Code, the Debtor believes there would be no distribution to Unsecured Creditors. For these reasons, the Debtor believes that the Plan is in the best interests of all Creditors and urges that the Plan be accepted.

Dated: <u>30 October 2023</u>

Sonavation, Inc.

By: <u>*Lisa M. Rhoads*</u>
    Lisa Rhoads, Chief Executive Officer

<u>/s/ Paul N. Mascia</u>
Paul N. Mascia, Esq.
Florida Bar No. 0489670
Michael A. Nardella, Esq.
Florida Bar No. 051265
**Nardella & Nardella, PLLC**
135 W. Central Blvd., Ste. 300
Orlando, Florida 32801
Phone: (407) 966-2680
Facsimile: (407) 966-2681
Email: pmascia@nardellalaw.com
Email: mnardella@nardellalaw.com
Secondary email: klynch@nardellalaw.com

15

**EXHIBIT A**

**PLAN OF LIQUIDATION**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:

                                                 Case no. 23-bk-13960-EPK

SONAVATION, INC.,                            Chapter 11

          Debtor.

_____/

## <u>DEBTOR'S PLAN OF LIQUIDATION</u>

**Dated October 30, 2023**

Paul N. Mascia, Esq.
Florida Bar No. 489670
Michael A. Nardella, Esq.
Florida Bar No. 051265
**Nardella & Nardella, PLLC**
135 W. Central Blvd., Suite 300
Orlando, FL 32801
(407) 966-2680
pmascia@nardellalaw.com
mnardella@nardellalaw.com
klynch@nardellalaw.com

Attorneys for Debtor and
Debtor in Possession

**TABLE OF CONTENTS**

**ARTICLE I -- DEFINITIONS - INTERPRETATION** ....................................1
    A.    Definitions.................................................................1
    B.    Bankruptcy Code Definitions.......................................4
    C.    Interpretation............................................................4

**ARTICLE II -- TREATMENT AND CLASSIFICATION**
**OF CLAIMS AND INTERESTS** ..................................................4
    A.    General Rules of Classification ....................................4
    B.    Unimpaired ...............................................................4
    C.    Impaired ...................................................................5
    D.    Allowed Priority Tax Claims .......................................5
    E.    Allowed Administrative Claims ...................................5
    F.    Impairment/Classification Controversies.......................6

**ARTICLE III -- EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ...........6

**ARTICLE IV -- ACCEPTANCE OR REJECTION OF PLAN;**
**EFFECT OF REJECTION BY ONE OR MORE CLASSES** ......................................6
    A.    Classes Entitled to Vote .............................................6
    B.    Class Acceptance Requirement.....................................6
    C.    Cramdown ................................................................6

**ARTICLE V -- MEANS FOR IMPLEMENTATION OF PLAN** .............................6
    A.    The Liquidating Trust ................................................7
    B.    Liquidating Trustee ...................................................7
    C.    Potential Sale of Equity Interests.................................7
    D.    Sale of Tangible Assets and Related Litigation Rights ............................8

**ARTICLE VI -- PROVISIONS GOVERNING DISTRIBUTION**............................9
    A.    Distributions............................................................9
    B.    De Minimis Distributions ..........................................10
    C.    Disbursing Agent ......................................................10
    D.    Cash Payments .........................................................10
    E.    Delivery of Distributions ...........................................10
    F.    Time Bar to Cash Payments ........................................11

**ARTICLE VII -- PROCEDURES FOR RESOLVING**
**AND TREATING CONTESTED CLAIMS** .........................................11
    A.    Objection Deadline ...................................................11
    B.    Prosecution of Objections...........................................11
    C.    No Distributions Pending Allowances............................11
    D.    Escrow of Allocated Distributions ...............................11

     E.     Distributions After Allowance ..................................................................11

     F.     Distributions After Disallowance ............................................................12

**ARTICLE VIII -- TRUSTEE FEES** ...........................................................................12

Debtor, Sonavation, Inc., files this Plan pursuant to Section 1121 of the Bankruptcy Code.

## ARTICLE I -- DEFINITIONS - INTERPRETATION

    **A.**   **Definitions**.  For purposes of this Plan, the following definitions shall apply unless the context clearly requires otherwise:

    Administrative Expense shall mean a cost or expense of administration of the Chapter 11 Case allowed under §§503(b) and 507(a)(2) of the Bankruptcy Code.

    Allowed when used with respect to a Claim or Interest, shall mean a Claim or Interest (a) proof of which was filed with the Bankruptcy Court on or before the Bar Date, and (i) as to which no objection has been filed by the Objection Deadline, unless such Claim or Interest is to be determined in a forum other than the Bankruptcy Court, in which case such Claim or Interest shall not become allowed until determined by Final Order of such other forum and allowed by Final Order of the Bankruptcy Court; or (ii) as to which an objection was filed by the Objection Deadline, to the extent allowed by a Final Order; (b) allowed by a Final Order; or (c) listed in the Debtor's schedules filed in connection with this Chapter 11 Case and not identified as contingent, unliquidated, or disputed.

    Bankruptcy Rules mean the Federal Rules of Bankruptcy Procedure, as amended, and as supplemented by the Local Rules of Practice and Procedure of the Bankruptcy Court, as amended.

    Bar Date shall mean the date fixed by order of the Bankruptcy Court by which a proof of Claim or Interest must be filed against the Debtor.

    Bankruptcy Code shall mean 11 U.S.C. §101 et seq., and any amendments thereto.

    Bankruptcy Court shall mean the United States Bankruptcy Court, Southern District of Florida, West Palm Beach Division, and any court having competent jurisdiction to hear appeals or certiorari proceedings therefrom.

    Board of Directors shall mean Lisa Rhoads and Juaquin Viso.

    Bankruptcy Estate shall the estate created by the filing of this case as defined by 11 U.S.C §541.

    Business Day shall mean any day except Saturday, Sunday, or any legal holiday.

    Chapter 11 Case shall mean the above referenced Chapter 11 reorganization case of the Debtor pending in the Bankruptcy Court.

Claim shall mean, as defined in §101(5) of the Bankruptcy Code:  (a) any right to payment from the Debtor, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

Class means a group of Claims or Interests substantially similar to each other as classified under this Plan.

Confirmation Date shall mean the date of entry of the Confirmation Order.

Confirmation Order shall mean the order entered by the Bankruptcy Court confirming the Plan.

Contested when used with respect to a Claim or Interest, shall mean a Claim or Interest that is not an Allowed Claim or Interest.

Disallowed when used with respect to a Claim or Interest, shall mean a Claim or Interest to the extent 10 days has expired since it has been disallowed by order of the Bankruptcy Court, unless proper application for a stay of such order has been made within such 10 day period, in which case the Claim or Interest shall be disallowed 30 days after entry of the order disallowing such Claim or Interest, unless prior to the expiration of such period, a stay is obtained with respect to the order disallowing the Claim or Interest.

Disclosure Statement means the disclosure statement of the same date as this Plan that was filed by the Debtor and approved by the Bankruptcy Court pursuant to Bankruptcy Code Section 1125 and any amendments thereto, including all exhibits.

Effective Date shall mean: (a) if no stay of the Confirmation Order is in effect, then the date which is a Business Day selected by the Debtor, not more than thirty (30) days following the date of the Confirmation Order; or (b) if a stay of the Confirmation Order is in effect, then the date which is a Business Day selected by the Debtor,   not more than thirty (30) days following the date the stay is vacated or any appeal, rehearing, remand or petition for certiorari is resolved in a manner that does not reverse or materially modify the Confirmation Order.

Equity Interests means the common equity interests in the Debtor.

Exculpated Parties means, collectively, the Board of Directors, each of their respective current related entities and their officers, directors, managers, employees, agents, attorneys, financial advisors, accountants, investment bankers, investment advisors, consultants, agents, representatives, successors, and assigns.

2

Final Order means an order of the Bankruptcy Court, which order shall not have been reversed, stayed, modified or amended and the time to appeal from or to seek review or rehearing of such order shall have expired and which shall have become final in accordance with applicable law.

Liquidating Trustee shall mean the person or entity who is in charge of the Liquidating Trust and who will manage and control the Trust Assets on the Effective Date of the Plan. In addition to the powers noted herein, the Liquidating Trustee shall have all the powers and authority of a trustee under applicable Florida law and will be a fiduciary to the Estate and its creditors.

Liquidating Trust shall mean the Trust to be established on the Effective Date by this Plan.

Objection Deadline means the date by which objections to Claims and Interests must be filed with the Bankruptcy Court which shall be 30 days after the Confirmation Date, unless otherwise extended by the Bankruptcy Court.

Patents shall refer to the Patents owned by the Debtor listed on Exhibit "A" attached hereto.

Petition Date shall mean May 22, 2023, the date on which the petition for relief was filed in the Chapter 11 case.

Plan shall mean this Chapter 11 plan, as amended in accordance with the terms hereof or modified in accordance with the Bankruptcy Code.

Preferred Equity Interests means all classes of preferred equity interests in the Debtor.

Priority Non-Tax Claim shall mean a Claim entitled to priority pursuant to §§507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6) or 507(a)(7) of the Bankruptcy Code.

Priority Tax Claim shall mean a Claim entitled to priority pursuant to §507(a)(8) of the Bankruptcy Code.

Pro Rata Share means the ratio that the amount of a particular Allowed Claim or Interest bears to the total amount of Allowed Claims or Interests of the same class, including Contested Claims or Interests, but not including Disallowed Claims or Interests, as calculated by the Liquidating Trustee as of the date distributions are made as provided in the Plan.

Secured Claim shall mean a Claim secured by a lien against property in which the Debtor has an interest, or which is subject to setoff under §553 of the Bankruptcy Code to the extent of the value (determined in accordance with §506(a) of the Bankruptcy Code) of the interest of the holder of such Claim in the Debtor's interest in such property or to the extent of the amounts subject to such setoff, as the case may be.

Unsecured Claim means a Claim other than an Administrative Expense, a Priority Non-Tax Claim, a Priority Tax Claim, or a Secured Claim.

**B.** **Bankruptcy Code Definitions**. Definitions in the Bankruptcy Code and Bankruptcy Rules shall be applicable to the Plan unless otherwise defined in the Plan. The rules of construction in Bankruptcy Code §102 shall apply to the Plan.

**C.** **Interpretation**. Unless otherwise specified, all section, article and exhibit references in the Plan are to the respective section in, article of, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. Words denoting the singular number shall include the plural number and vice versa, and words denoting one gender shall include the other gender. As to contested matters, adversary proceedings, and other actions or threatened actions, this Plan and the Disclosure Statement shall not be construed as a stipulation or admission, but rather, as a statement made in settlement negotiations.

## ARTICLE II -- TREATMENT AND CLASSIFICATION OF CLAIMS AND INTERESTS

Claims against and Interests in the Debtor will be classified and treated as follows except to the extent otherwise agreed.

**A.** **General Rules of Classification**. Generally, a Claim or Interest is classified in a particular Class only to the extent the Claim or Interest qualifies within the description of the Class and is classified in another Class or Classes to the extent any remainder of the Claim qualifies within the description of such other Class. If a Claim qualifies for inclusion in a more specifically defined Class, then the Claim shall be included only in the more specifically defined Class. Notwithstanding anything contained herein to the contrary, if a Claim is not allowed, then the Debtor is not bound by any classification made or implied herein.

**B.** **Unimpaired**. The following classes of Claims are unimpaired:

Class I - Allowed Other Secured Claims. This Class consists of Secured Claims not otherwise classified under the Plan. Debtor is not aware of any claims in this class. The Plan does not alter the legal, equitable, or contractual rights of the holders of such Claims.

**Class II - Allowed Non-Tax Priority Claims**. This Class consists of Claims entitled to priority under Code sections 507(a)(1)-(7), except Administrative Expenses. Debtor is not aware of any claims in this Class. Holders of such Claims shall receive, on account of such Claims, cash in the amount of such Claims.

    **C.**    **Impaired**. The following Claims and Interests are impaired:

**Class III - Equity Interests**. The Allowed Equity Interests in the Debtor shall be either canceled as of the Effective Date, or alternatively marketed for an Equity Sale (defined in Section V.C. below) by the Equity Broker (defined in Section V.C. below) and then either conveyed pursuant to the Equity Sale, or alternatively cancelled to the extent that any such Equity Interests are not sold at an Equity Sale.

**Class IV- Allowed Secured Claim of Cross Match Technologies, Inc**. This Claim consists of Cross Match Technologies, Inc.'s secured blanket lien on Debtor's business assets. In the event of an Equity Sale, the holder of this Allowed Claim will retain its lien. In the event of an Asset Sale, the holder of this Allowed Claim will receive on account of such Claim the net proceeds of the Asset Sale in the order of its priority.

**Class V –Allowed Junior Secured Claims.** This Class consists of the Claims of Soninvest, LLC, Karl Weintz, Locke Lord, LLC, MD Anderson – University of Texas, and Healthcare Investments, Inc., all holders of Allowed Claims secured by a blanket lien on the Debtor's business assets that is junior to the claim of Cross Match. In the event of an Equity Sale, the holder of this Allowed Claim will retain its lien. In the event of an Asset Sale, the holder of this Allowed Claim will receive on account of such Claim the net proceeds of the Asset Sale in the order of their priority.

**Class VI- Allowed Unsecured Claims**. The holders of such Claims shall receive on account of such Claims a Pro Rata Share of the proceeds of the Equity Sale and those of the Asset Sale after payment to Classes IV and V.

**Class VII- Allowed Claim of Healthcare Investments, LLC for Post-Petition Financing**. The holder of this Allowed Claim shall be entitled to $25,000 plus interest of 5% on the date that all of the holders of Allowed Claims in Classes I through VI are paid in full.

    **D.**    **Allowed Priority Tax Claims**.    The holders of Allowed Priority Tax Claims will receive on account of such Claims monthly payments, over a period not longer than 5 years following the Petition Date, in an aggregate amount equal to the Allowed amount of the Claims, together with interest at the rates determined under applicable non bankruptcy law as on the month the Court enters the Confirmation Order.

    **E.**    **Allowed Administrative Claims**. Each holder of an Allowed Administrative Expense against the Debtor shall receive on account of such Claim, the

amount of such holder's Allowed Administrative Expense in one cash payment on the Distribution Date, or shall receive such other treatment as agreed upon in writing by the Debtor and such holder, provided that: (i) an Administrative Expense representing a liability incurred in the ordinary course of business by the Debtor may be paid in the ordinary course of business by the Debtor; and (ii) the payment of an Allowed Administrative Expense representing a right to payment under §365(b)(1)(A) and §365(b)(1)(B) of the Bankruptcy Code may be made in one or more cash payments over a period of twelve (12) months or such other period as is determined to be appropriate by the Bankruptcy Court.

**F.    Impairment/Classification Controversies**. If there is a controversy regarding the classification or impairment of a Claim or Interest, such controversy shall be determined by the Bankruptcy Court after notice and a hearing.

### ARTICLE III -- EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The Debtor is not aware of any unexpired leases or executory contracts. However, if any exist, they are rejected through the Plan.

### ARTICLE IV -- ACCEPTANCE OR REJECTION OF PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES

**A.    Classes Entitled to Vote**.    Each impaired Class of Claims or Interests shall be entitled to vote separately to accept or reject the Plan. Any unimpaired Class of Claims or Interests shall not be entitled to vote to accept or reject the Plan.

**B.    Class Acceptance Requirement**. A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds in amount and more than one-half in number of the Allowed Claims of such class that had voted on the Plan. A Class of Interests shall have accepted the plan if it is accepted by at least two-thirds in amount of the Allowed Interests of such Class that had voted on the Plan. If any ballot is executed and timely filed by the holder of an Allowed Claim or Interest but does not indicate acceptance or rejection of the Plan, then the ballot shall be deemed to be an acceptance.

**C.    Cramdown**.    If any impaired Class of Claims or Interests shall fail to accept the Plan in accordance with Bankruptcy Code §1129(a), the Debtor reserves the right to request that the Bankruptcy Court confirm the Plan in accordance with Bankruptcy Code §1129(b).

### ARTICLE V -- MEANS FOR IMPLEMENTATION OF PLAN

Recoveries for creditors in this case will come from the Sale of the Debtor's Assets by the Liquidating Trust and the potential sale of the Equity Interests of the Debtor.

The Bankruptcy Estate and the Exculpated Parties shall not have or incur any liability to any person or entity, including any Holder of a Claim or Equity Interest, for any act or omission taken or not taken in connection with, relating to, or arising out of the Chapter 11 Case, including but not limited to: the negotiation and filing of the Plan, the Filing of the Chapter 11 Case, the prosecution and/or settlement of Claims, the performance, termination or rejection of Executory Contracts, the pursuit of confirmation of the Plan, the consummation of the Plan, the administration of the Plan, the property to be Distributed under the Plan, the manner of and any amount realized from any disposition or attempted disposition of the Debtor's assets, any IRC 382 Restructuring (defined below) or any matter relating to the preservation of an opportunity for the Debtor to realize potential value presented by its historical net operating losses (collectively, the "Post-Petition Activities"), except for their fraud, willful misconduct, or gross negligence or any obligations that they have under or in connection with the Plan or the transactions contemplated in the Plan.

A. **The Liquidating Trust**. The Plan provides for the creation of the Liquidating Trust, responsible for the sale of the Debtor's Intangible Assets and the potential sale of the Equity Interests in the Debtor.  If the Equity Interests in the Debtor do not sell through the Plan, then the Equity Interests of the Debtor will be cancelled through the Plan.  Holders of Allowed Claims shall be beneficiaries of the Liquidating Trust and entitled to distributions based on the priority and timing set forth in the Plan. The Liquidating Trust will be controlled by the Liquidating Trustee.  The Liquidating Trust will be vested with all the Debtor's Bankruptcy Estate.

The Liquidating Trust, through the Liquidating Trustee, shall have the full and complete power and authority to perform the provisions of the Plan in such manner as the Liquidating Trust may deem necessary or appropriate to discharge all obligations assumed by the Liquidating Trust or provided herein and to conserve and protect the trust assets or to give to the holders of Allowed Claims the benefits intended to be conferred upon them by this Plan.

B. **Liquidating Trustee**. The Plan provides for the role of a Trustee (the "Liquidating Trustee") to control the Liquidating Trust and guide efforts to recover the maximum value for the Equity Interests and Assets of the Debtor for the benefit of creditors with Allowed Claims. The initial Liquidating Trustee shall be Lisa Rhoads. The Liquidating Trustee shall be governed by the terms of the Plan, as described below. The Liquidating Trustee shall have the duties and responsibilities as set forth in the Plan and shall be retained, and may be terminated, as provided for in the Plan. However, the Liquidating Trustee shall have all the powers and rights of a Trustee under Chapter 7 and 11 of the Bankruptcy Code.

**C.**    **Section 1146 Exemption**.  The Plan provides that, pursuant to Section 1146(a) of the Code, the issuance, transfer or exchange of any security under the Plan or the making or delivery of any instrument of transfer pursuant to, in implementation of, or as contemplated by, the Plan or the re-vesting, transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of, or as contemplated by, the Plan shall not be taxed under any state or local law imposing a stamp tax, transfer tax or similar tax or fee.

**D.**    **Potential Sale of Equity Interests**.

1.    The Debtor has arranged for Hillandale Advisors (the "Equity Broker") to act as Equity Broker to assist the Debtor in attempting to obtain value from the net operating losses for the estate through a sale of the Debtor's Equity Interests. To engage its services, the Equity Broker requires the funding of upfront costs and fees in the amount of $50,000.00 (the "Equity Broker's Retainer"), as is more particularly set forth in the terms of the Equity Broker's engagement letter (attached hereto as Exhibit "B").

2.    The Debtor lacks the resources to pay the Equity Broker's Retainer. However, in the solicitation package which shall be sent out with the Plan and Disclosure Statement, the Debtor will provide interested parties with the opportunity to advance the Equity Broker's Retainer on or before fourteen (14) days after the Confirmation Date (the "Retainer Deadline").

3.    If no interested party advances to the Equity Broker the Equity Broker's Retainer on or before the Retainer Deadline, then there shall be no sale of the Debtor's Equity; and in such event the Debtor's Equity Interests shall be cancelled on the Effective Date.

4.    If an interested party advances the Equity Broker's Retainer to the Equity Broker on or before the Retainer Deadline, then the Liquidating Trustee shall, within thirty (30) days after the Confirmation Date, prepare and file bidding procedures for the sale of the Debtor's Equity Interests, to be approved by the Court (the "Equity Bidding Procedures").

5.    Upon the Court's approval of the Equity Bidding Procedures, the Equity Broker shall market the Debtor's Equity Interests for not less than thirty (30) days and conduct a sale of some or all of the Debtor's Equity Interests to the highest bidder, free and clear of all claims and interests (the "Equity Sale"), and utilizing a transaction structure to vest the Debtor's Equity in the name of the buyer consistent with the buyer's goal of preserving the net operating losses of the Debtor in accordance with applicable tax laws, including without limitation 26 U.S.C. § 382 (an "IRC 382 Restructuring"). Upon the consummation of an Equity Sale, any portion of the Debtor's Equity Interests not conveyed in connection with the Equity Sale will either be cancelled or retained by the existing

common stockholders on a pro-rata basis.

6.      The sales proceeds from any Equity Sale shall be conveyed to the Liquidating Trust for further distribution in accordance with its terms.

**D.**      <u>**Sale of Intangible Assets and Related Litigation Rights**</u>.

1.      If there is not a successful Sale of Equity Interests, the Debtor will proceed with a sale of the Debtor's Intangible Assets and related causes of action, as follows:

2.      The Debtor's assets consist of the Patents and the Debtor's trade secrets, along with all causes of action ("Causes of Action") related to the same (the "Intangible Assets").

3.      During the case, the Debtor has solicited offers for the sale of the Intangible Assets. Toler Law Group, PC, (the "Asset Stalking Horse") has made a bid (the "Stalking Horse Bid" attached hereto as Exhibit "C") consisting of a cash component of $20,000 and a participation component of sixty percent (60%) of the net proceeds from any litigation of the Causes of Action pertaining to the Intangible Assets.

4.      Upon the Effective Date, the Debtor's Intangible Assets will vest in the Liquidating Trust.

5.      To be qualified, each bid must consist of a cash component and a participation component.

6.      The Debtor has arranged for Peak Value IP LLC (the "Asset Broker") to act as Asset Broker to assist the Debtor in marketing the Intangible Assets and conducting the related Asset Sale. The Asset Broker has agreed to conduct the Asset Sale for a success fee in accordance with the terms more particularly set forth in the terms of the Asset Broker's engagement letter (attached hereto as Exhibit "D").

## <u>ARTICLE VI -- PROVISIONS GOVERNING DISTRIBUTION</u>

**A.**      <u>**Distributions**</u>. The Liquidating Trust will make distributions under the Plan as follows:

1.      The proceeds of any Equity Sale shall be paid first to the interested party that advanced the Equity Broker's Retainer in an amount equal to the Equity Broker's Retainer, then to the Equity Broker in satisfaction of the terms of its engagement, then to Allowed Administrative Claims, and then to Allowed Unsecured Claims. The amount of the Allowed Unsecured Claims will depend on the extent of proceeds received from the

Asset Sale, and accordingly, shall not be finally determined until the conclusion of the Causes of Action sold in connection with the Asset Sale.

2. The proceeds of the Asset Sale will be made first to the Asset Broker in satisfaction of the terms of its engagement, then to Allowed Administrative Claims, then to Allowed Claims in the order of priority of the liens on the assets, then to Allowed Unsecured Claims and then to Allowed Class VII Claims. Accordingly, distributions will be made as a waterfall first to the allowed claim holder in Class IV, until paid in full, and then to the Allowed Claim holder in Class V until paid in full, etc. through each class until holders of Allowed Claims in Class VI. The Distributions shall be made to Administrative Claims on the date of the closings of the Asset Sale and any Equity Sale.

3. Distributions to Classes IV through V shall be made thirty days after the conclusion of the last Cause of Action sold in connection with the Asset Sale.

4. Distributions to Class VI shall be made on the date that the holders of Allowed Claims in Classes IV through V are paid in full.

5. All distributions shall be made Pro Rata.

6. In the event that there remains any proceeds available for distribution after the foregoing distributions described above (the "Remaining Proceeds"), such Remaining Proceeds shall be distributed to the former holders of Equity Interests according to their respective liquidation preferences, such that distributions shall first be made to Preferred Equity Interests in accordance with their related liquidation preferences, and then, if thereafter there remains any further Remaining Proceeds, the same shall be distributed to the former holders of Equity Interests who owned the common stock of the Debtor, pro-rata according to the their prior relative percentage ownership.

**B.** **De Minimis Distributions**. Notwithstanding any other provision of the Plan, there shall be no distribution of less than $20.00 on account of any Allowed Claim or Interest.

**C.** **Disbursing Agent**. The Liquidating Trustee shall make all distributions required under the Plan.

**D.** **Cash Payments**. Cash payments made pursuant to the Plan shall be in U.S. funds, by check drawn against a domestic bank, or by wire transfer from a domestic bank.

**E.** **Delivery of Distributions**. Distributions and deliveries to holders of Allowed Claims and Interest shall be made at the addresses set forth on the proofs of Claim or Interests filed by such holders (or at the last known addresses of such holders if no proof of Claim or Interest is filed or if the Debtor has been notified of a change of address). If

10

any distribution to a holder is returned as undeliverable, then no further distributions to such holder shall be made unless and until the Debtor is notified of the holder's then-current address, at which time all missed distributions shall be made to such holder, without interest. All Claims for undeliverable distributions shall be made on or before the fifth anniversary of the Distribution Date. After such date, all unclaimed property shall revert to the Debtor, and the claim of any holder with respect to such property shall be discharged and forever barred.

     **F.**    **<u>Time Bar to Cash Payments</u>**.   Checks issued by the Debtor in respect of Allowed Claims shall be null and void if not cashed within ninety (90) days of the date of issuance thereof. Requests for reissuance of any checks shall be made directly to the Debtor by the holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check shall be made on or before the later of the fifth anniversary of the Distribution Date or ninety (90) days after the date of issuance of such check. After such date, all claims in respect of void checks shall be discharged and forever barred.

### <u>ARTICLE VII -- PROCEDURES FOR RESOLVING<br>AND TREATING CONTESTED CLAIMS</u>

     **A.**    **<u>Objection Deadline</u>**.   Unless extended by the Bankruptcy Court, the Debtor shall file any objections to Claims or Interest no later than thirty (30) days after the Confirmation Date.

     **B.**    **<u>Prosecution of Objections</u>**.   The Debtor shall have authority to file objections, litigate to judgment, settle, or withdraw objections to Contested Claims or Interests. All professional fees and expenses incurred by the Debtor from and after the Confirmation Date shall be paid in the ordinary course of business without further order of the Bankruptcy Court.

     **C.**    **<u>No Distributions Pending Allowances</u>**.   No payments or distributions shall be made with respect to any Contested Claim or Interest unless and until all objections to such Claim or Interest are resolved and such Claim becomes an Allowed Claim or Interest.

     **D.**    **<u>Escrow of Allocated Distributions</u>**.   The Debtor shall withhold from the property to be distributed under the Plan and shall place in escrow amounts sufficient to be distributed on account of Contested Claims and Interest as of the Effective Date. As to any Contested Claim, upon a request for estimation by the Debtor, the Bankruptcy Court shall determine what amount is sufficient to withhold in escrow pending Disallowance of the Claim or Interest. The Debtor shall also place in escrow any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the property withheld in escrow pursuant hereto, to the extent such property continues to be withheld in escrow at the time such distributions are made, or such obligations arise. If practicable, the

11

Debtor may invest any cash it has withheld in escrow in a manner that will yield a reasonable net return, considering the safety of the investment.

   **E.**   **Distributions After Allowance**.   Payments and distributions from escrow to each holder of a Contested Claim or Interest, to the extent that such Claim or Interest ultimately becomes an Allowed Claim or Interest, shall be made in accordance with the provisions of the Plan governing the Class of Claims or Interests to which the respective holder belongs. As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Claim or Interest becomes a Final Order, any property in escrow that would have been distributed prior to the date on which a Contested Claim or Interest became an Allowed Claim or Interest shall be distributed, together with any dividends, payments, or other distributions made on account of, as well as any obligations arising from, the property from the date such distributions would have been due had such Claim or Interest then been an Allowed Claim or Interest to the date such distributions are made.

   **F.**   **Distributions After Disallowance**.   If any property withheld in escrow remains after all objections to Contested Claims or Interests of a particular class have been resolved, then such remaining property, to the extent attributable to the Contested Claims or Interests, shall be distributed as soon as practicable in accordance with the provisions of the Plan governing the class of Claims or Interests to which the Disallowed Claim or Interest belong.

## ARTICLE VIII -- TRUSTEE FEES

   All fees payable under 28 U.S.C §1930, will be paid when due.

Dated: 30 October 2023

Sonavation, Inc.

By: *Lisa M. Rhoads*
  Lisa Rhoads, Chief Executive Officer

        */s/Paul N. Mascia*
        Paul N. Mascia, Esq.
        Florida Bar No. 0489670
        Michael A. Nardella, Esq.
        Florida Bar No. 051265
        **Nardella & Nardella, PLLC**
        135 W. Central Blvd., Ste. 300
        Orlando, Florida 32801

12

Phone: (407) 966-2680
Facsimile: (407) 966-2681
Email: pmascia@nardellalaw.com
Email: mnardella@nardellalaw.com
Secondary email: klynch@nardellalaw.com

## **EXHIBIT A**

### **LIST OF DEBTOR'S PATENTS**

[attached]

**Sonavation, Inc.**

Patent Portfolio - List of Active Assets

| Patent No. | Family | Title | Status (Grant / Application) | Priority Date | Expiration date | PVIP Indicated Category |
|---|---|---|---|---|---|---|
| US10571434 | 1 | Acoustic sensing through a barrier | Grant | 10/20/2015 | 10/20/2036 | Fingerprint Imaging |
| US10422772 | 1 | Acoustic sensing through a barrier | Grant | 10/20/2015 | 1/9/2037 | Fingerprint Imaging |
| US10621404 | 2 | Biometric sensing device for three dimensional imaging of subcutaneous structures embedded within finger tissue | Grant | 2/6/2013 | 2/6/2034 | Fingerprint Imaging |
| US10528785 | 2 | Method and system for beam control in biometric sensing | Grant | 2/6/2013 | 2/6/2034 | Fingerprint Imaging |
| US9607206 | 2 | Biometric sensing device for three dimensional imaging of subcutaneous structures embedded within finger tissue | Grant | 2/6/2013 | 6/30/2034 | Fingerprint Imaging |
| CA2900479 | 2 | BIOMETRIC SENSING DEVICE FOR THREE DIMENSIONAL IMAGING OF SUBCUTANEOUS STRUCTURES EMBEDDED WITHIN FINGER TISSUE | Application | 2/6/2013 | 2/6/2034 | Fingerprint Imaging |
| JP2018192266 | 2 | BIOMETRIC SENSING DEVICE FOR THREE-DIMENSIONAL IMAGING OF SUBCUTANEOUS STRUCTURES EMBEDDED WITHIN FINGER TISSUE | Application | 2/6/2013 | 5/29/2038 | Fingerprint Imaging |
| US8433110 | 3 | Pulse-rate detection using a fingerprint sensor | Grant | 12/11/2009 | 10/16/2031 | Fingerprint Imaging |
| US9056082 | 4 | Multiplexer for a piezo ceramic identification device | Grant | 3/23/2009 | 8/29/2031 | Fingerprint Imaging |
| KR101805676 | 4 | IMPROVED MULTIPLEXER FOR A PIEZO CERAMIC IDENTIFICATION DEVICE | Grant | 3/23/2009 | 3/23/2030 | Fingerprint Imaging |
| CA2756449 | 4 | IMPROVED MULTIPLEXER FOR A PIEZO CERAMIC IDENTIFICATION DEVICE | Application | 3/23/2009 | 3/23/2030 | Fingerprint Imaging |
| TWI515664 | 4 | Improved multiplexer for a piezo ceramic identification device | Grant | 3/23/2009 | 3/22/2030 | Fingerprint Imaging |
| IN2011KN04139 | 4 | IMPROVED MULTIPLEXER FOR A PIEZO CERAMIC IDENTIFICATION DEVICE | Application | 3/23/2009 | 10/7/2031 | Fingerprint Imaging |
| US8503740 | 5 | Methods and apparatus for digit swipe sensor data streaming | Grant | 5/12/2008 | 6/7/2030 | Fingerprint Imaging |
| US8634604 | 6 | Method and system for enhanced image alignment | Grant | 5/5/2008 | 1/22/2031 | Fingerprint Imaging |
| US7236616 | 7 | Biometric image scanner | Grant | 8/9/1999 | 10/6/2021 | Fingerprint Imaging |
| US9841318 | 8 | Apparatus for acoustic sensing | Grant | 4/30/2010 | 7/13/2032 | Manufacturing |
| JP2014504162 | 8 | An electric system, a method, and a device of the fingerprint sensor which uses sound in ペディオグラフィ | Application | 10/19/2010 | 10/19/2031 | Manufacturing |
| US8703040 | 9 | Method for manufacturing a piezoelectric ceramic body | Grant | 6/19/2009 | 8/24/2031 | Manufacturing |
| CN102484200 | 9 | The manufacture method of piezoelectric ceramic body | Grant | 6/19/2009 | 6/20/2030 | Manufacturing |
| IN349542 | 9 | METHOD FOR MANUFACTURING A PIEZOELECTRIC CERAMIC BODY | Grant | 19/06/2009 | 3/1/2032 | Manufacturing |
| US7109642 | 10 | Composite piezoelectric apparatus and method | Grant | 11/29/2003 | 11/29/2024 | Manufacturing |
| US7459836 | 10 | Composite piezoelectric apparatus and method | Grant | 11/29/2003 | 11/29/2024 | Manufacturing |
| US8335356 | 11 | Mechanical resonator optimization using shear wave damping | Grant | 5/8/2008 | 1/15/2031 | Piezo Pillars |
| US8331633 | 12 | Method and system for multi-mode mechanical resonator | Grant | 5/8/2008 | 12/11/2030 | Piezo Pillars |
| EP2289018 | 12 | Sensor for capturing an image of a fingerprint | Grant | 5/8/2008 | 5/8/2029 | Piezo Pillars |
| CN102077219 | 12 | Method and system for multi-mode mechanical resonator | Grant | 5/8/2008 | 5/7/2029 | Piezo Pillars |
| KR101634821 | 12 | METHOD AND SYSTEM FOR MULTI-MODE MECHANICAL RESONATOR | Grant | 5/8/2008 | 5/8/2029 | Piezo Pillars |
| JP5653910 | 12 | The method and system for a multi-mode mechanical resonance machine | Grant | 5/8/2008 | 5/8/2029 | Piezo Pillars |
| JP5781677 | 12 | Method and system for a multimode mechanical resonator | Grant | 5/8/2008 | 5/8/2029 | Piezo Pillars |
| IN2010KN04593 | 12 | METHOD AND SYSTEM FOR MULTI-MODE MECHANICAL RESONATOR | Application | 5/8/2008 | 12/2/2030 | Piezo Pillars |
| US8805031 | 13 | Method and system for acoustic impediography biometric sensing | Grant | 5/8/2008 | 10/8/2030 | Piezo Pillars |
| CN102171706 | 13 | For the method and system of acoustic impediography biometric sensing | Grant | 5/8/2008 | 5/7/2029 | Piezo Pillars |
| CN104537335 | 13 | Method and system for acoustic impediography biometric sensing | Grant | 5/8/2008 | 5/7/2029 | Piezo Pillars |
| US8515135 | 14 | PLL adjustment to find and maintain resonant frequency of piezo electric finger print sensor | Grant | 5/6/2008 | 4/14/2031 | Sensor Calibration |
| USRE47158 | 15 | Piezoelectric identification device and applications thereof | Grant | 3/23/2009 | 3/23/2029 | Ultrasonic Transducer |
| US8508103 | 15 | Piezoelectric identification device and applications thereof | Grant | 3/23/2009 | 3/23/2029 | Ultrasonic Transducer |
| KR101812498 | 15 | IMPROVED PIEZOELECTRIC IDENTIFICATION DEVICE AND APPLICATIONS THEREOF | Grant | 3/23/2009 | 3/23/2030 | Ultrasonic Transducer |
| JP5899342 | 15 | An improvement piezo-electricity discernment device and its use | Grant | 3/23/2009 | 3/23/2030 | Ultrasonic Transducer |
| CN102428480 | 15 | Improved piezoelectric identification device and applications thereof | Grant | 3/23/2009 | 3/22/2030 | Ultrasonic Transducer |
| JP5759444 | 15 | An improvement piezo-electricity discernment device and its use | Grant | 3/23/2009 | 3/23/2030 | Ultrasonic Transducer |
| CA2756284 | 15 | Improved piezoelectric identification device and applications thereof | Grant | 3/23/2009 | 3/23/2030 | Ultrasonic Transducer |
| CN104815791 | 15 | Improved piezoelectric identification device and its application | Grant | 3/23/2009 | 3/22/2030 | Ultrasonic Transducer |
| TWI505196 | 15 | Improved piezoelectric identification device and applications thereof | Grant | 3/23/2009 | 3/22/2030 | Ultrasonic Transducer |
| US8489901 | 16 | Methods and systems for secure encryption of data | Grant | 5/5/2008 | 5/17/2030 | User Authorization |

**<u>EXHIBIT B</u>**

**Proposed Hillandale Advisors Engagement Letter for Potential Equity Sale**

[attached]

## CONSULTING AGREEMENT

This Consulting Agreement (this "**Agreement**") is entered into as of October __, 2023 (the "**Effective Date**"), by and between Hillandale Advisors, LLC, a Delaware limited liability company, having an address of 429 East Blvd, Charlotte, NC 28203 ("**Consultant**"), and Sonavation, Inc. a Delaware corporation (the "**Company**"), having an address of _____, Attn:  Legal Department.

Subject to Bankruptcy Court approval, this Agreement sets forth the terms and conditions pursuant to which Consultant will provide certain consulting services to the Company as described herein.  The engagement described herein shall be in accordance with Applicable Law (as defined below) and pursuant to the following procedures, terms, and conditions.

1.    Bankruptcy Court Approval

1.1    The Company is a Debtor in a case pending in the Bankruptcy Court, Southern District of Florida (the "Court") styled Sonavation, Inc, Case number 23-bk-13960 -EPK. (the "Case").

1.2    Pursuant to the Debtor's Plan filed in the Case, if an interested party pays a $50,000 (the "Equity Broker's Retainer") no later than fourteen days after the confirmation of the Plan, the   Company will file motions to (a) retain the Consultant (b) approve the Consultant's Compensation; (c) approve bidding procedures for Sale of the Debtor's Equity; and (d) schedule a sale of the Debtor's Equity consistent with this Agreement.

2.    SERVICES.

2.1    Subject to Court approval, the Company hereby engages Consultant, and Consultant hereby accepts such engagement, as an independent contractor to provide certain consulting services to the Company on the terms and conditions set forth in this Agreement. Consultant agrees that Matt Hultquist will be primarily responsible for providing  the Services (as defined below) hereunder, provided that Consultant may engage other employees or agents, reasonably acceptable to the Company, to perform the Services on behalf of Consultant at Consultant's sole expense.

2.2    Consultant shall provide to the Company the services set forth on **Schedule 1** (the "**Services**") in connection with assisting the management team of the Company to source strategic capital partners for strategic transaction(s) involving the Company (*e.g.*, an indirect or direct sale of equity in the Company) (each, a "**Transaction**"); *provided,* that the parties agree that any Transaction involving direct or indirect equity in the Company is intended to be structured such that Consultant may rely on a federal exemption as an "M&A Broker", as such term is defined in 15 U.S.C.A. § 78, including, without limitation, structuring the Transaction such that equity sold would consist of a controlling piece of the Company's or an

affiliate of the Company's equity securities (consistent with the definition of "control" as defined 15 U.S.C.A. § 78o).

2.3     The Company shall not control the manner or means by which Consultant performs the Services.  Consultant will devote such time and efforts to the performance of the Services as Consultant deems reasonably necessary or appropriate.

3.     TERM. The term of this Agreement shall commence as of the date set forth above and shall continue until terminated by either party in accordance with Section 9 below (the "**Term**").

4.     FEES AND EXPENSES.

4.1     Retainer.  Consultant shall be paid a retainer fee of $50,000 (the "**Equity Broker's Retainer**"),

4.2     Transaction Fees.   Consultant shall be entitled to a fee equal to $50,000 (the "**Stalking Horse Fee**"), payable in cash on the first day of the month following the receipt of the stalking horse bid.

 Consultant shall be entitled to a fee of 2.0% equity value ("**the Transaction Fee**") of the restructured Sonavation ("NEWCO") for any transaction at least for $1 million but under $2 million. For example, if the transaction is $1.5 million for 40% of the company, 2% of $3.75 million or $75,000 in common stock would be granted to Consultant.

 Consultant shall be entitled to a fee of 3.0% equity value ("**the Transaction Fee**") of the restructured Sonavation ("NEWCO") for any transaction of at least $2 million. For example, if the transaction is $5 million for 40% of the company, 3% of $12.5 million or $375,000 in common stock would be granted to Consultant.

 Consultant shall be entitled to Transaction Fees upon the closing of the relevant Transaction in common stock.

4.3     Notwithstanding Section 4.2, Consultant and the Company acknowledge and agree that, any Transaction Fee for any Transaction shall be paid from the proceeds of the consummated Transaction and in no case will  Consultant have a claim against the Company's bankruptcy estate other than as to the proceeds of the consummated Transaction,  Moreover, if entitlement to the Transaction Fee for any Transaction would be impermissible under or otherwise violate any Applicable Law,  Consultant's entitlement  to the Transaction Fee hereunder with respect to the applicable Transaction shall be null and void; *provided, however*, in such event, the Company and  Consultant agree to work together in good faith to find an alternative scope of Services or fee arrangement that is permissible under Applicable Law.

4.4     Expenses.

(a)     In addition to any fees or retainer payable to Consultant hereunder, Consultant shall be reimbursed for all reasonable out-of-pocket expenses (including,

1096460358\10\AMERICAS

without limitation,  travel, accommodation, and communication expenses and the reasonable fees and disbursements of legal counsel to  Consultant) incurred by Consultant in connection with performing its obligations hereunder.

(b)    For the avoidance of doubt, other than from the proceeds of a consummated Transaction, the Company shall not be responsible for any direct expenses incurred by the Company in connection with a Transaction, including, without limitation, fees and disbursements of the Company's legal counsel, accountants, and other advisors, as well as expenses relating to printing  materials and any fees and expenses of filing with any regulatory body (but not with respect to Consultant's regulatory compliance) and any road show costs and expenses of  Consultant and the Company's personnel.

5.    RELATIONSHIP OF THE PARTIES.  Consultant is an independent contractor of the Company, and this Agreement shall not be construed to create any association, partnership, joint venture, employee, or agency relationship between Consultant and the Company for any purpose. Consultant has no authority (and shall not hold himself out as having authority) to bind the Company and Consultant shall not make any agreements or representations on the Company's behalf without the Company's prior written consent in each instance.

6.    CONFIDENTIALITY.

6.1    Consultant acknowledges that Consultant will have access to information that is treated as confidential and proprietary by the Company, including, without limitation, the existence and terms of this Agreement, trade secrets, technology, and information pertaining to business operations and strategies, customers, pricing, marketing, finances, sourcing, personnel, or operations of the Company, its  suppliers or customers, in each case whether spoken, written, printed, electronic, or in any other form or medium (collectively, the "**Confidential Information**"); provided that the Confidential Information shall not include any information that is (i) already in the possession of Consultant before being disclosed by the Company under this Agreement; (ii) is or becomes available to the public other than as a result of, directly or indirectly, any violation of this Agreement by the Consultant; or (iii) is or becomes available to Consultant from a third party not known by Consultant to be in breach of any obligation of confidentiality to the Company. Any Confidential Information that Consultant develops in connection with the Services, including but not limited to any marketing materials, shall be subject to the terms and conditions of this clause. Consultant agrees to treat all Confidential Information as strictly confidential, not to disclose Confidential Information or permit it to be disclosed, in whole or part, to any third party without the prior written consent of the Company in each instance, and not to use any Confidential Information for any purpose except as required in the performance of the Services. Consultant shall notify the Company immediately in the event Consultant becomes aware of any loss or disclosure of any Confidential Information.

6.2    Consultant agrees to use all Confidential Information provided to it by or on behalf of the Company hereunder solely for the purpose of providing the Services that are the subject of this Agreement and to treat all such information confidentially as set forth above; *provided, however*, that nothing herein shall prevent the Consultant from disclosing any such

3

information (a) to its affiliates and the directors, officers, agents, employees, consultants, and advisors of Consultant and its affiliates in each case who need to know the information in connection with the Services to be provided hereunder and are subject to confidentiality duties or obligations that are no less restrictive than the terms and conditions of this Agreement; (b) to potential capital sources in connection with a Transaction who have entered into a confidentiality agreement with respect to a potential Transaction, (c) pursuant to the order of any court or administrative agency or in any pending legal or administrative proceeding, (d) upon the request or demand of any governmental authority or regulatory body having jurisdiction over Consultant, (e) to the extent that such information was or becomes publicly available other than by reason of disclosure by Consultant in violation of this Agreement or was or becomes available to Consultant from a source that is not known by Consultant to be subject to a confidentiality obligation to the Company, or (f) to Consultant's employees, legal counsel, independent auditors, and other experts or agents who need to know such information in connection with a Transaction or any other services provided by Consultant to the Company.

7.    REPRESENTATIONS AND WARRANTIES; COVENANTS.

7.1    Consultant represents, warrants, and covenants to the Company that:

(a)    Consultant has the right to enter into this Agreement, to grant the rights granted herein and to perform fully all of Consultant's obligations set forth in this Agreement.

(b)    Consultant's entering into this Agreement with the Company and Consultant's performance of the Services do not and will not conflict with or result in any breach or default under any other agreement to which Consultant is subject.

(c)    Consultant has the required skill, experience, and qualifications to perform the Services in a professional and workmanlike manner in accordance with industry standards for similar services.

(d)    Consultant is not currently registered as a "broker" or "dealer" within the meaning of Section 3(a)(4) of the Securities Exchange Act of 1934 (the "**Exchange Act**"), as amended, at the federal level nor registered as a broker or dealer under applicable state securities or blue sky laws, and is not required, nor by entering into this Agreement or performing hereunder (relying on the accuracy of Section 6.2(c)) shall be required, to register as a broker or dealer at the federal or state level.

(e)    Consultant shall perform the Services hereunder in compliance with all applicable law, including, without limitation, all federal laws, rules and regulations, requirements of the Securities Act of 1933, as amended, and the Exchange Act, state laws rules and regulations, including state securities or blue sky laws, rules and regulations of any regulatory body promulgated thereunder, including, without limitation, the Securities and Exchange Commission, the Financial Industry Regulatory Authority, the National Association of Securities Dealers, and state securities commissions, and any other regulations, rules and orders of any governmental authority,

4

including any common or customary law, judicial decisions, constitution, code, ordinance, statute or other legislative measure and any regulation, rule, treaty, order, decree or judgment ("**Applicable Law**").

(f)    Consultant is solely responsible for its own compliance with Applicable Law, including, without limitation, registering as a broker or dealer, or partnering with a registered broker or dealer, if permitted, at the federal and state level, if so required, to perform the Services hereunder.

(g)    Under no circumstances shall Consultant have custody, control, or possession of or otherwise handle funds or securities issued or exchanged in connection with a Transaction.

(h)    In no event shall Consultant engage in any public offering or general solicitation in respect of a Transaction.

(i)    Consultant shall not directly, or indirectly through any of its affiliates, provide financing for a Transaction. If Consultant assists the Company or a potential investor or prosect to obtain financing from unaffiliated third parties, Consultant shall comply with all applicable legal requirements and shall disclose in writing to the Company any compensation received in respect of such financing.

(j)    Consultant on behalf of itself and on behalf of each owner, manager, officer, director and employee of Consultant, hereby represents and warrants that each such person (i) has not been barred from association with a broker-dealer by the Securities and Exchange Commission, any state or any self-regulatory organization; and (ii) is not suspended from association with a broker-dealer by the Securities and Exchange Commission, any state or any self-regulatory organization.

(k)    Consultant agrees to only furnish information and materials to potential capital sources that are provided or approved by the Company, and Consultant agrees to not misrepresent the Company's business and prospects in discussions with such capital sources.

7.2    The Company hereby represents, warrants and covenants to Consultant that:

(a)    it will seek from the Court full right, power, and authority to enter into this Agreement  and to perform its obligations hereunder.

(b)    the execution of this Agreement by its representative whose signature is set forth at the end hereof has been duly authorized by all necessary corporate action.

(c)    the Company understands and agrees that Consultant is not providing any legal, regulatory, accounting or tax advice, and Consultant will engage its own professional advisors for legal, regulatory, accounting, tax and other similar advice.

(d)    the Company does not have any class of securities registered, or required to be registered, with the Securities and Exchange Commission under Section 78l of the

1096460358\10\AMERICAS

Exchange Act or with respect to which the Company files, or is required to file, periodic information, documents, and reports.

(e)     in its last fiscal year, the earnings of the Company before interest, taxes, depreciation, and amortization were less than $25,000,000.

(f)     subject to Consultant's obligation to maintain the confidentiality of any information not yet disclosed by the Company to the public, the Company will make available to Consultant all information concerning the projects, business, assets, operations, financial condition and prospects of the Company that Consultant reasonably requests in connection with the services to be performed for the Company hereunder, and shall provide Consultant with reasonable access to the Company's officers, managers, employees, customers, partners, independent accountants and other advisors and agents as Consultant shall deem, in its reasonable discretion, appropriate or necessary.

(g)     to the Company's knowledge, all information furnished by the Company or on its behalf to Consultant will be accurate and complete in all material respects, and the Company shall notify Consultant immediately whenever the Company becomes aware that any such information is no longer accurate.

(h)     the Company will, prior to executing any legally binding documents regarding a Transaction, provide any counterparty or prospective counterparty with: (i) the most recent fiscal year-end financial statements of the Company as customarily prepared by the Company in the normal course of operations, and if the financial statements of the Company are audited, reviewed, or compiled, any related statement by the independent accountant, a balance sheet prepared within 120 days, and (ii) information pertaining to the management, business, results of operations and material loss contingencies of the Company for the period covered by the foregoing financial statements; and

(i)     the Company is solely responsible for its own compliance with Applicable Law.

8.    <u>INDEMNIFICATION</u>.

8.1    Consultant shall defend, indemnify, and hold harmless the Company and its and its officers, directors, employees, agents, successors, and assigns (the "**Company Indemnified Parties**") from and against all losses, damages, liabilities, deficiencies, actions, judgments, interest, awards, penalties, fines, costs, or expenses of whatever kind, including but not limited to government fines and penalties, reasonable attorneys' fees, and reasonable related costs arising out of or resulting from (together, "**Consultant's Indemnified Matters**"):

(a)     Consultant's breach of any representation, warranty, covenant or obligation made by Consultant under this Agreement.

6

(b)    any material misrepresentation or untrue statement of a material fact in any document furnished by Consultant, to potential capital sources, or the omission or the alleged omission to state, including in the documents furnished by Consultant, to potential capital sources a material fact necessary in order to make statements made not misleading in light of the circumstances under which they were made (except to the extent such misrepresentations, untrue statements or omissions are based on information provided to Consultant by the Company or are in materials that have been approved by the Company); and

(c)    Consultant's bad faith, gross negligence or willful misconduct in performing the Services described herein.

8.2    The indemnification and expense reimbursement provided by Section 8.1 shall be a continuing right to indemnification and expense reimbursement and shall survive the expiration or termination of this Agreement and any winding up, dissolution, liquidation, or bankruptcy of either party and shall remain binding upon any successor in interest or other assignee.

9.    [RESERVED.]

10.    TERMINATION.

10.1    Following the first ninety (90) days following the Effective Date, either party may terminate this Agreement at any time, with or without cause, upon thirty (30) days prior written notice to the other.  Notwithstanding the foregoing, either party may terminate this Agreement at any time by providing written notice to the other party upon the material breach by the other party; provided, however, that no such termination shall be effective unless such breach remains uncured within ten (10) days following the breaching party's receipt of written notice of such breach by the other party, and provided further that such cure must be acceptable to the non-breaching party, in its sole and absolute discretion.

10.2    In the event of any termination of  Consultant's engagement hereunder by the Company pursuant to Section 10.1,  Consultant will continue to be entitled to the full amount of the Transaction Fee in the event that at any time prior to the expiration of one (1) year after any such termination the Company consummates a Transaction, or enters into an agreement with respect to a Transaction with any party who was identified for, or introduced to, the Company or its affiliates by  Consultant during the engagement period; *provided* that Consultant will (i) not be entitled to any Transaction Fee if this Agreement was terminated due to  Consultant's material breach thereof  and (ii) provide to the Company within sixty (60) days of termination of this Agreement a list of parties which  Consultant introduced to the Company prior to such termination.

10.3    Upon expiration or termination of this Agreement for any reason, or at any other time upon the Company's written request, Consultant shall promptly:

(a)    deliver to the Company all investment materials (whether complete or incomplete), including any information memorandum, marketing materials,

7

presentations or other materials prepared by Consultant in connection with this Agreement,

(b)    deliver to the Company all tangible documents and materials (and any copies) containing, reflecting, incorporating, or based on the Confidential Information.

(c)    use commercially reasonable efforts to permanently erase all the Confidential Information from Consultant's computer systems; and

(d)    certify in writing to the Company that Consultant has complied with the requirements of this clause.

10.4    The terms and conditions of this clause and <u>Section 3</u>, <u>Section 5</u>, <u>Section 6</u>, <u>Section 7</u>, <u>Section 9</u>, <u>Section 10</u>, <u>Section 11</u>, and <u>Section 12</u> shall survive the expiration or termination of this Agreement.

11.    <u>LIMITATION OF DAMAGES</u>. Notwithstanding anything in this Agreement to the contrary, in no event shall: (i) the Company have liability under this Agreement other than for the proceeds of a consummated Transaction: (ii) Consultant have liability under this Agreement in excess of the amount actually received under this Agreement (*i.e.*, Equity Broker's Retainer, and Transaction Fees received by Consultant); and (iii) Consultant be liable to the Company or its assigns, successors, officers, directors or investors for any lost profits or any incidental, consequential, punitive, special or indirect damages, arising out of or in connection with this Agreement, the Services or the breach of this Agreement, regardless of whether the claim for such damages is based in contract, tort, strict liability or otherwise nor shall the Company make such claim nor provide support for such claim by any third party whatsoever.

12.    <u>ASSIGNMENT</u>. Neither party shall assign any rights, or delegate or subcontract any obligations, under this Agreement without the other party's prior written consent.  Any assignment in violation of the foregoing shall be deemed null and void. Subject to the limits on assignment stated above, this Agreement will inure to the benefit of, be binding on, and be enforceable against each of the parties hereto and their respective successors and assigns.

13.    <u>MISCELLANEOUS</u>.

13.1    All notices, requests, consents, claims, demands, waivers, and other communications hereunder (each, a "**Notice**") shall be in writing and addressed to the parties at the addresses set forth on the first page of this Agreement (or to such other address that may be designated by the receiving party from time to time in accordance with this Section). All Notices shall be delivered by personal delivery, nationally recognized overnight courier (with all fees prepaid), facsimile or email (with confirmation of transmission), or certified or registered mail (in each case, return receipt requested, postage prepaid). Except as otherwise provided in this Agreement, a Notice is effective only if (a) the receiving party has received the Notice and (b) the party giving the Notice has complied with the requirements of this Section.

13.2    This Agreement, together with any related exhibits and schedules, constitutes the sole and entire agreement of the parties thereto with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

13.3    This Agreement may only be amended, modified, or supplemented by an agreement in writing signed by each party hereto, and any of the terms thereof may be waived, only by a written document signed by each party to this Agreement or, in the case of waiver, by the party or parties waiving compliance.

13.4    This Agreement shall be governed by and construed in accordance with the internal laws of the State of Florida without giving effect to any choice or conflict of law provision or rule. Each party irrevocably submits to the exclusive jurisdiction and venue of the Court in any legal suit, action, or proceeding arising out of or based upon this Agreement or the Services provided hereunder.

13.5    If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

13.6    This Agreement may be executed in multiple counterparts and by facsimile signature, each of which shall be deemed an original and all of which together shall constitute one instrument.

[Signature Page Follows.]

1096460358\10\AMERICAS

IN WITNESS WHEREOF, the parties hereto agree to this Agreement as of the date first set forth above.

**ADVISOR:**                              **COMPANY:**

**HILLANDALE ADVISORS, LLC**              **SONAVATION, INC.** a Delaware
a Delaware limited liability company      corporation


By: _____              By:_____
Name:_____             Name:_____
Its: _____             Its:_____

10

1096460358\10\AMERICAS

## **EXHIBIT C**

**Stalking Horse Bid**
[attached]

October 27, 2023

Sonavation
801 US Highway 1
North Palm Beach, Florida 33408

Attn: Lisa Rhoads, CEO

Re:    Acquisition of Intellectual Property Assets Held by Sonavation

Dear Ms. Rhoads,

This letter (the "***Letter Agreement***") is intended to summarize the principal terms of the Asset Stalking Horse Bid by Toler Law Group, PC, or its designee (the Stalking Horse") of certain intellectual property assets (the "***Intangible Assets***" including the patent families listed in  in Exhibit A to this Letter Agreement and including trade secrets and other related intellectual property) held by Sonavation, Inc ("***Debtor***").  The Buyer makes this offer as the "Stalking Horse Bidder in Debtor's Chapter 11 proceeding pending in the Bankruptcy Court for the Southern District of Florida, and is subject to approval by that court.

This Letter Agreement supersedes and replaces all previous offers and other communications covering the Property, whether written or oral.

The terms of the Proposed Transaction are as follows:

      1.      **Structure of Proposed Transaction**.  If there is not a successful Sale of Equity Interests under the Debtor's Plan of Liquidation (the "Plan"), The Debtor's Intangible Assets will vest in the Liquidating Trust on the Effective Date and the Liquidatinng Trust will proceed with a sale of the Intangible Assets as follows:

      2.      **Retention of the Asset Sale Broker**.  On the Effective Date the Liquidating Trustee shall file an application to retain the Asset Sale Broker.

      3.      **Stalking Horse Bid.**  An advance toward the purchase price for the Property (the "***Stalking Horse Bid***") shall be equal to Twenty thousand U.S. Dollars ($20,000.00). and a participation component of sixty percent (60%) of the net proceeds from any litigation of the Causes of Action pertaining to the Intangible Assets.

1.

        i.   "Net Proceeds" means the gross amount of any consideration (prior to any deductions or reductions) received by the Buyer in connection with the Property, including without limitation, any licensing fee, litigation settlement fee, payment of damages or other remedies, sale or other transaction payment, and any other consideration, assets and proceeds payable to the Buyer (each a "Monetization Event"), less:

           1.   Contingent Fees (or other attorney fees) of Counsel;

1

2. Advanced Costs (including but not limited to reverse engineering expenses, counsel out-of-pocket expenses, discovery expenses, expert witness expenses and subject matter expert consultant fees); and

3. Patent Costs (including but not limited to patent prosecution expenses, patent office fees, and Post Grant Review/*Inter Parties* Review/Covered Business Method Review and Re-Examination expenses).

b. The Stalking Horse Bid shall be payable in cash on the Effective Date of the Debtor's Plan of Liquidation.

c. Within thirty (30) days after the Effective Date, the Liquidating Trustee shall in conjunction with the Asset Sale Broker prepare and file bidding procedures for the sale of the Debtor's Intangible Assets, to be approved by the Court (the "Asset Bidding Procedures"). Thereafter, the Liquidating Trustee shall within sixty (60) days conduct an auction of the Intangible Assets (the "Asset Sale") utilizing the Asset Bidding Procedures which will have been approved by the Court. The sale will be free and clear of all claims and interests.

d. If the Stalking Horse is not the successful bidder at the sale, the Salking Horse Bid will be returned to the Stalking Horse.

2. **Closing Conditions.**   In addition to standard closing conditions, including the requirement that all representations and warranties under the Contract be true and correct as of the date of closing, closing under the Contract shall be conditioned upon satisfying the specific conditions described below.

a. **Seller's Closing Conditions**.   Seller's obligation to close shall be conditioned upon Seller's receipt of any required internal and external consents.

b. **Buyer's Closing Conditions**.   Buyer's obligation to close shall be conditioned upon the following:

i. Buyer's receipt of any required internal and external consents.

ii. Buyer's receipt of financing required to fund the Purchase Price.

iii. Buyer's receipt from Seller of the Documents described in the Document Request Form listed in Exhibit B to this Letter Agreement.

3. **Transfer of Property**.   At Closing, Seller shall convey the Property to Buyer. Buyer shall cooperate with Seller in preparing any documentation required to reflect the transfer of the Property from Seller to Buyer. To the extent that Seller conducts due diligence, Seller agrees that the Property will be conveyed to Buyer "free and clear" of any liens, governmental or sovereign restrictions, or other financial encumbrances not contemplated by the Letter Agreement or otherwise

disclosed in the Contract.  For avoidance of doubt, Seller is under no obligation to execute any assignment document before the receipt of the Purchase Price in full.

4.      **Transactional Costs.**  Each of Buyer and Seller shall bear their own costs and expenses associated the Proposed Transaction. Buyer shall be responsible for all fees and costs incurred for Transfer of Property.

5.      **Representations and Warranties.**

    a.  **Seller's Representations and Warranties**.  Under the Contract, Seller will make standard representations and warranties with respect to Seller's authority to close the Proposed Transaction.

    b.  **Buyer's Representations and Warranties**.  Under the Contract, Buyer shall make standard representations and warranties with respect to Buyer's authority to close the Proposed Transaction.

6.      **Assignment**.  Buyer may, with Seller's consent, which consent shall not be unreasonably withheld, assign all of its right, title and interest in and to this Letter Agreement to an affiliate or third party ("***Buyer Assignee***").

    a.  .

7.      **Amendment and Waiver**.  This Letter Agreement may not be amended except by an agreement in writing signed by both Seller and Buyer.  Any waiver of a condition by a party or waiver of an obligation of the other party shall be effective only if in writing and signed by the party waiving such condition or obligation.

8.      **Notices**.  All notices required or permitted to be given under this Letter Agreement shall be effective for all purposes if: (i) hand delivered; (ii) sent by certified or registered United States mail, postage prepaid, return receipt requested; (iii) sent by expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery; or (iv) sent by facsimile, addressed to the party at the address set forth on the signature pages to this Letter Agreement, with copies to such additional parties also set forth on the signature pages to this Letter Agreement.  A notice shall be deemed to have been given: (a) in the case of hand delivery, at the time of delivery; (b) in the case of registered or certified mail, when delivered or the first attempted delivery on a federal banking day; (c) in the case of expedited prepaid delivery, upon the first attempted delivery on a federal banking day; or (d) in the case of facsimile, upon sender's receipt of a machine-generated confirmation of successful transmission after advice by telephone to recipient that a facsimile notice is forthcoming. Any party may change its address for notices under this Letter Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address.

9.      **Counterparts**.  For convenience, this Letter Agreement may be signed in more than one counterpart and signature pages may be exchanged by facsimile or by electronic mail.

*Remainder of Page Intentionally Left Blank.*

*Signature Page Follows.*

3

This Letter Agreement is not all-inclusive and contains only general parameters of a Proposed Transaction.  If the structure outlined above is acceptable to Seller, please sign and scan a copy of the signature page of this Letter Agreement to Jeff Toler at jtoler@tlgiplaw.com

Very truly yours,

By: _____

Jeff Toler,
President

Toler Law Group, C

**ACCEPTED:**

Sonavation
801 US Highway 1
North Palm Beach, Florida 33408

**By: _____**

**Lisa Rhoads, CEO**

Exhibit A
Description of the Property

Subject to the terms of the Contract, Buyer will choose three of any or all of the patent families listed below Upon the Closing the Selected Assets are to be transferred from Seller to Buyer, a Buyer Designee or Buyer Assignee by an instrument mutually agreed upon by Buyer and Seller in the Contract.

List all patent assets of Sonavation- by family.

1

Exhibit B
Document Request Form

"Documents" is defined as the patent prosecution files and all other documents, communications and files (electronic or otherwise) relating to the Patents in possession or control of Seller and its agents, including its counsel and related parties, that pertain to the ownership, prosecution, maintenance and enforcement of the Patents. For purposes of clarification only, below is a non-exclusive list of documents that fall within this description. Buyer requests that Seller conduct a thorough and diligent search for all Documents in its custody or control, and that of its agents, counsel or related parties, including, but not limited to, such Documents which are listed below.

1. File histories including
    a. Prosecution file history for the Patents listed in Exhibit A of the Letter Agreement ("Patents"), including:
        i. File histories of any Patent
        ii. File histories of any parent, child or other related patents/applications (i.e. those that claim priority to any Patent or that any Patent either claims priority to and/or incorporates by reference)
        iii. All communications with, by and to prosecution counsel or agent with respect to the Patents
    b. Any prior art references that have been retained in the files
    c. Pre-filing documents such as:
        i. Invention disclosure records
        ii. Inventor notebooks
        iii. Memos, notes, letters, emails etc. requesting that a patent application be prepared
        iv. Memos, notes, letters, emails etc. discussing the decision of whether to file a patent application
        v. Memos, notes, letters, emails etc. discussing or describing any products that the proposed invention relates to
        vi. Documents, including without limitation any memos, notes, letters, emails, presentations, etc. related to or arising from any efforts to create products based on the proposed inventions, relating to the design, development, marketing, sale, offers for sale, public disclosure, or ownership of the products, the proposed inventions and/or patents, including any agreements with third parties (e.g. joint development (or similar) agreements or non-disclosure agreements).
        vii. All documents related to the conception, reduction to practice, or development of the invention.
    d. Post-issuance documents such as:
        i. Ribbon copies of the Patents
        ii. Certificates of correction and related documents (notes, memos etc. related to requests for correction)
        iii. Re-examinations; reissues; post grant review/challenges
        iv. Memos regarding payment of maintenance fees and/or annuities (including recommendations of whether or not to pay maintenance fees)
2. Any agreements, to the extent in Seller's custody or control, granting any rights under the Patents (including without limitation any licenses, releases, covenants not to sue or any other grant or right) related to or arising from the Patents and applications (including the related patents and applications described in 1.a.i.), whether expired or current
3. Any documents, to the extent in Seller's custody or control, discussing enforcement, threatened enforcement, investigation of infringement, licensing (including all offers to license), liens or charges, valuation, granting any rights under any of the claims of the

Exhibit B
Document Request Form

acquired patents (including releases, covenants not to sue or any other grant or right) or other monetization related to or arising from the Patents including:

a. Documents that relate in any way to an evaluation of the Patents including without limitation documents that relate to strengths, weaknesses etc. of the enforceability and/or validity of the patents, infringement and/or non-infringement of any specific entity or by industries in general

b. Documents that relate to the enforceability of the Patents

c. Documents that relate to the validity of the Patents

d. Documents that either are, or discuss a damages analysis regarding any of the Patents

4. Any documents related to marking of patented articles including articles made by Seller that were or should have been marked, and marking requirements (including steps taken to enforce marking requirements) in any agreements identified pursuant to request 2 above

5. Assignments of the Patents

6. Any documents relating to governmental incentives or other programs relating to the technology underlying the Patents.

7. Names of law firms and/or individual lawyers involved in any of the Patents so that the privileged nature of any produced documents can be determined

8. Documents related to each named inventor of the Patents including:

a. Employment agreements with each inventor

b. Patent Assignments signed by each inventor

c. Invention Assignments signed by each inventor

d. Employment/HR records of each inventor

e. Separation agreements signed by any inventor

2

# **EXHIBIT D**

## **Asset Broker's Engagement Letter**

[attached]



**IP Asset Sale - DRAFT**

October 24, 2023

Sonavation, Inc.
801 US Highway 1
North Palm Beach, Florida 33408

Attention:   Lisa Rhoads
                      Acting CEO and Chair

Dear Ms. Rhoads,

This engagement agreement (the "<u>Agreement</u>") sets out the terms and conditions on which Sonavation, Inc, a Florida corporation (together with its subsidiaries and affiliates, hereafter "<u>Sonavation</u>" or the "<u>Company</u>") seeks to engage Peak Value IP, LLC (hereinafter referred to as "<u>Peak Value</u>"), to provide certain services related to the sale of the Company's intellectual property ("IP"). The effort to sell the IP is described in this Agreement (the "<u>Services</u>") in <u>Exhibit A</u> (the "<u>Project</u>"). Peak Value agrees to use its reasonable best efforts, consistent with customary practice, to effect and assist with the completion of the Project as soon as practicable.  The Company is a Debtor in the case styled In re: Sonavation, Inc., Case No. 23-13960-EPK pending in the Bankruptcy Court Soutern District of Florida West Palm Beach Division (the "Case"), and this Agreement is subject to the approval of that court.

**Section 1.    Services**

As described in the Plan of Liquidation filed in the Case, the Company is planning to sell its Equity Interests (the "Equity Sale").  If the Equity Sale does not occur, the Company will proceed with the Project to sell its Intangible Assets, as described in the Plan.  Peak Value will provide patent brokerage services as it relates to the Company's Intangible Assets. The patent portfolio consists of patent 40 granted patents and applications covering a several geographies. The recommended approach for brokerage is designed with the objective of transacting the IP assets in total, most likely to a patent enforcement agent.

Peak Value will rely upon previously developed marketing collateral for selling the IP Assets, but it will require an update to the following tasks:

•      IP Asset Assessment
•      IP Asset Valuation
•      Marketing Collateral
•      Auction Process Services



**Section 2.      Patent Portfolio Brokerage Process**

To prepare for the IP Asset sale in a bankruptcy structured process, Peak Value will follow the preliminary steps before conducting its outreach under the Stalking Horse Bid auction process:

**IP Asset Assessment:**

Peak Value will rely upon the previously completed portfolio mining and evidence of use analysis conducted. Additional review of the patents will be necessary given potential expirations.

**IP Asset Valuation:**

Peak Value will provide the Company with an indication of transaction value that will assist with pricing the portfolio for sale. This will go in connection with the Stalking Horse Bid already provided by the Toler Law Group. Additional transactions support could provide potential bidders with reason to provide a higher offer than the stalking horse bid. Providing additional support for the valuation will be used to assist with negotiating a price, providing rational to support pricing. The valuation will be based on similar transaction pricing of other portfolios of similar size and technology.

**Marketing Collateral:**

Concurrent to the valuation and pricing analysis, Peak Value will develop new marketing material to send out to potential buyers of the patents. The marketing collateral will set forth the time schedule for review, due diligence, and bidding.

**Divestment Services:**

Peak Value's approach to the auction process will be to reach out to patent assertion entities, or patent litigation funding companies. Peak Value has already attempted to sell the IP Assets to operating companies without success. Accordingly, only patent enforcement agents will be bidding on the Company's IP Assets.

**Timing:**

Peak Value estimates the initial due diligence, and the following outreach will require 120 to 180 hours. The budgeted hours will allow Peak Value to create meaningful due diligence documents, conduct its outreach, and allow for due diligence from the bidding parties. The feedback from potential buyers will inform us of the markets' willingness to acquire the IP Assets. After the first six weeks of outreach, if Bidders are not interested, the Company can allow the Stalking Horse Bid to complete its acquisition.



**Section 3.      Company Information**

The Company agrees to furnish Peak Value with such information as Peak Value reasonably requests in connection with the performance of the Services (the "<u>Information</u>"). The Company agrees to give Peak Value access, within reason, to the Company's officers, directors, employees, accountants, legal counsel, primary shareholders or members, lenders, and other representatives (collectively, the "<u>Company Representatives</u>"). The Company will cause the Company Representatives to provide to Peak Value any Information that Peak Value may reasonably request concerning the Company, its operations, and its financial condition.

**Section 4.      Fees and Expenses**

(a)   The fee arrangement is outlined in the Exhibits.

(b)   Peak Value can begin this project upon receipt of the signed engagement letter with retainer to follow shortly thereafter.

(c)   Upon completion of the Valuation and Marketing Collateral, Peak Value will begin its outreach services to the agreed upon potential buyers.

**Section 5.      Confidentiality**

The parties agree on mutual Confidentiality of the Services being provided pursuant to this Agreement and that all Information provided by the Company or Peak Value pursuant to this Agreement is Confidential Information.  Notwithstanding anything to the contrary contained in this Agreement, the parties agree that Confidentiality shall be enforced as between the parties.

**Section 6.      No Third-Party Beneficiaries**

The Company's engagement of Peak Value is not deemed to be on behalf of, and is not intended to confer rights upon, any shareholder, member, partner or other owner of the Company or any other person not a party hereto as against Peak Value or any of its affiliates or any of their respective directors, officers, agents, employees, or representatives. Unless otherwise agreed in writing, no person or entity other than the Company is authorized to rely upon the Company's engagement of Peak Value or any statements, advice, opinions or conduct by Peak Value.

**Section 8.      Miscellaneous**



(a) The parties hereto each represent and warrant, with respect to itself, that this Agreement has been duly executed and delivered on its behalf and constitutes the legal, valid, and binding agreement and obligation of such party.

(b) This Agreement may be executed electronically in two or more counterparts, all of which together shall be considered a single instrument.

(c) This Agreement may be amended only by written instrument duly executed and delivered by all the parties hereto.

(d) Nothing in this Agreement is intended to obligate Peak Value or any of its affiliates to provide any services other than as set out in Section 1 of this Agreement.

(e) The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement, which shall remain in full force and effect. This Agreement, together with the Confidentiality Agreement, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings (both written and oral) of the parties hereto with respect to the subject matter hereof.

(f) The provisions of this Agreement shall inure to the benefit of, and be binding upon, the permitted successors and assigns of Peak Value and the Company. Peak Value may not assign any of its rights and obligations under this Agreement without the Company's prior written consent, which shall not be unreasonably withheld, conditioned, or delayed, provided, however, that Peak Value may assign any of its rights and obligations under this Agreement to Peak Value & Co., Inc., a Colorado LLC, without the Company's consent.

(g) Each party confirms that it has relied on its own legal counsel, accountants, and other similar expert advisors for legal, accounting, tax, and other similar advice. Peak Value has not provided to the Company any legal, regulatory, accounting, tax, or similar professional advice.

[SIGNATURE FOLLOWS]

To confirm your agreement with the foregoing, please sign and return the attached copy of this Agreement, whereupon this Agreement shall become effective as of the execution date hereof.

**PEAK VALUE IP, LLC**


By: _____
     Matt Moyers
     Managing Director

**Confirmed, Agreed, and Accepted**

**Sonavation, Inc.**

By: _____
Lisa Rhoads
Acting Chief Executive Officer and Chair

6



### Exhibit A

### Stalking Horse Auction Process

| | |
|---|---|
| Stalking Horse Offer: | Current offer from Toler Law Group |
| Break Fee: | None |
| Expense Reimbursement: | $500 for use of financial services database plus on-going expenses not to exceed $5,000 |
| Minimum Bid Increments: | Upfront cash payment in increments of $10K; and<br><br>Back-end participation increments by 5%. |



**Exhibit B**

**Compensation, Fees, and Expense Reimbursement**

1. *Fees* — A non-refundable cash retainer fee of $10,000 payable upon execution of this Agreement is the standard request for this type of brokerage engagement. Peak Value is willing to take that payment upon completion of the transaction as part of its commission. If a buyer is not found, Peak Value will take $10,000 of the initial payment from the Stalking Horse Bidder.

2. *Commission* - For this sell-side brokerage engagement, Peak Value charges a commission on the gross sale amount of six (6) percent of the closing price plus back-end compensation from licensing and/or litigation outcomes. For clarity, as an example, a six percent commission on a patent sale agreement resulting in a payment to the Company of $20,000 USD would generate a commission due to Peak Value of (6% x $20,000) = $3,000 plus six percent of gross licensing or litigation proceeds achieved from the acquiring entity. Further, if the acquiring entity receives litigation proceeds of $30M, Peak Value will receive $1.8M ($30M x 6%). This payment would occur for every positive litigation outcome that occurs using the Sonavation IP, and the initial cash retainer will be paid out of these outcomes.

3. *Expense Reimbursement* —Peak Value requires the use of a financial database that costs $500 to access the information and it will be expensed to the Company. Further, the Company hereby agrees to reimburse Peak Value for all reasonable travel and other out-of-pocket expenses in the amount actually incurred and paid in connection with or arising out of Peak Value's engagement hereunder. Reimbursable expenses incurred by Peak Value exceeding $500 individually, or $5,000 in aggregate, must be approved by the Company in writing. Peak Value agrees to provide appropriate documentation in support of such expenses as may be reasonably requested by the Company.

4. *Payment Due Dates* — The compensation, fees and expense reimbursement provided will follow the guidance of the Southern District of Florida's US Bankruptcy Court's guidance.

5. Payment Instructions
   Submit wire transfer and ACH payments to:
   - Bank name:           Zing Credit Union
   - Bank address:        3299 W. Alameda Ave., Denver, CO 80219
   - Account name:        Peak Value Capital, LLC
   - Account address:     562 S Union Blvd, Lakewood, CO 80228
   - Account:             1493845
   - Routing:             302075694

8



Make checks payable to "Peak Value & Co." and mail to:

    Peak Value & Co.

    Attn: Matt Moyers

    562 S Union Blvd

    Lakewood, CO 80228